## Case No. 3,763.

### The DELAWARE v. The OSPREY.

[2 Wall. Jr. 268;[1] 1 Am. Law Reg. 15; 1 Phila. 358, 401; 27 Hunt, Mer. Mag. 589; 9 Leg. Int. 82, 136; 4 Am. Law J. (N. S.) 533.]

Circuit Court, E. D. Pennsylvania. Sept. Term, 1852.

COLLISION AT NIGHT—STEAMER AND SAILING VESSEL.—SIGNAL LIGHTS.

1. Although the court cannot establish a rule to bind vessels navigating the high seas to carry signal lights, yet where one vessel does so and another does not, the court, in case of a collision, will go some way to treat the dark boat as the wrong doer.

[Cited in Baker v. The City of New York, Case No. 765; The Frank Moffatt, Id. 5,060. Explained in Pope v. The B. B. Forbes, Id. 11,275. Distinguished in The Hypodame, 6 Wall. (73 U. S.) 225.]

2. The court going in advance of hitherto adjudicated cases, would seem to enforce the obligation upon all boats navigating bays and rivers, not only to show lights on an approach, but to carry them constantly.

[Cited in The City of Savannah, 41 Fed. 893.]

The steamer Osprey was on her way to sea, out of Delaware bay, with three signal lanterns in place, heading for the lights of Cape Henlopen, on the west. The barque Delaware, without any lights, came into the capes with the wind free to pass up the bay, and the tide against her. When at some distance from the steamer, the sails of the barque shut out the Cape Henlopen lights from the pilot of the steamer, and from this fact the pilot inferred a sailing vessel was between him and them, and of course, that the sailing vessel was heading to starboard of the steamer. But the barque having no lights, and the night being very dark, neither her courses nor position were, after this, discoverable. Both vessels went on at their previous speed—that of the steamer about ten or eleven miles an hour; that of the barque four or five; and they were approaching each other at the rate of a mile in about four minutes. The steamer, having the tide, was approaching much faster than the captain of the barque was aware of. The captain of the barque, who was on deck, first saw the steamer's lights five miles off, but was not certain, for some time, that the vessel was a steamer. Being satisfied at last on this point, he ordered a signal light to be shown. The rapidity with which the vessels had approached and were still approaching, made the interval between this and the moment of collision, too short. The light did not appear to have been seen by the steamer's pilot, and the evidence, which was conflicting, made it doubtful whether it had

been exhibited before the collision became inevitable. Approaching in the rapid way above stated, and supposing the barque still to be, as her shutting out the Henlopen lights showed she had been, on the other side, the steamer put her helm to starboard; while the captain of the barque, not knowing that he had shut out these lights from the steamer, nor of the inference the steamer had drawn, that the barque was to the starboard, put his vessel to the starboard too, in order that the vessels might pass larboard to larboard. The steamer ran against the bow of the barque. Whether, if the barque had not gone to starboard, and had kept on her course, she would have cleared the steamer entirely, or whether, on the other hand, she would have been struck right amidships, and so gone to the bottom at once, was a matter about which the testimony conflicted. The two vessels came in collision near the bow of the barque, the wheels of the steamer rolling over the barque, and doing her, as the barque also did to the steamer, considerable damage. Cross libels were now filed.

By the usage of Delaware bay, vessels at anchor always hang out a light. Those not at anchor, usually, or often sail without them, steamers excepted; which, by statutes of the United States, as well as of Pennsylvania and New Jersey, are obliged to carry lights.

W. B. Reed and St. G. T. Campbell, for the barque.

The barque was not bound to carry lights. No maritime usage requires merchant vessels constantly to carry lights (The Rose, 2 W. Rob. Adm. 4); nor do the rules of the trinity masters, which we adopt (The Iron Duke, Id. 377). The statute of Pennsylvania does not apply to Delaware bay: and the statutes of the United States and of New Jersey, by confining the obligation of lights to steamers, directly exempt sailing vessels from the same obligation. By the usage and obligation of Delaware bay, vessels at anchor alone exhibit the signal lights. Had the barque exhibited such lights, she would probably have been assumed to be at anchor. They would have been false lights. She showed a light as soon as she saw a vessel approaching. She was not bound to do more. In other respects she conformed to the rules of good navigation. She had a watch on deck. She did not alter her course until it was rendered imminently necessary by the act of the steamer. Considering the darkness of the night, and the fact that she knew a vessel was somewhere ahead, the steamer was not navigated with the requisite caution. She was in a bay. She should have eased off for a few minutes. Admit that the barque ought to have carried lights, so that the steamer could have gone on without easing off, this is not important here, for in point of fact the barque was seen by the steamer, by her shutting out the Cape Henlopen lights. There was enough to put

the steamer on her guard. Admitting the barque's fault, the steamer had no right to run her down for it; the usual consequences of the fault having to a great degree been accidentally obviated in another way, by the shutting off the Henlopen lights. The case of The James Watt, 2 W. Rob. Adm. 270, syllabus, is much in point: "Where a steamer coming down the river, upon a dark night, meets a sailing vessel beating up the river, and the master of the steamer is in doubt what course the sailing vessel is upon, it is the duty of the master of the steamer to ease her engines and to slacken her speed, until he ascertains the course of the sailing vessel." "A defence—that the master of the steamer, under the circumstances, immediately put her helm to port, in compliance with the trinity house regulations—not sustained." It is true that case differs from this in the fact that there the sailing vessel was beating up the river, while here she had the wind free. But the case rests much more on the distinction between steamers and sailing vessels, the former of which, says Sir J. Nicholl, in another case (The Perth, 3 Hagg. Adm. 414), while they "are of vast power, liable to inflict great injury, may at the same time, with due vigilance easily avoid doing damage, for they are much under command, both by altering the helm and by stopping the engines." Even at her speed she would have gone clear had she kept her course, or ported her helm. The change from it, made suddenly and unwisely, in the circumstances, caused the collision. The counsel then cited many cases to show that the conduct of the barque when she came into close proximity of the steamer, was conformed to the directions of the trinity masters, and our own laws in the cases of vessels in positions like these and in danger of collision.

G. M. Wharton and Mr. Balch, on the other side, made the following points:

[That the steamer displayed proper lights, had a good and sufficient lookout, and was in every respect properly found, officered, and managed.][2] 1. The steamer pursued her course, the usual one, without change until the pilot saw the barque; from and after which point of time every thing possible was done on board the steamer to avoid and prevent the collision. 2. Backing the steamer with her helm to starboard was equivalent to going ahead with her helm to port. 3. Conceding that the steamer was going ahead with her helm a-starboard, this was the only manoeuvre left to her, and was the proper one under the circumstances of the case. 4. The barque, having the wind free, but with head tide, was more manageable than under any other circumstances. 5. The barque should have kept her helm to port, instead of putting it to starboard; in which case she would have gone clear of the steamer.

6. It was the duty of the barque, which had descried the steamer five miles off, to do every thing in her power to avoid the collision by showing a light, making a noise, &c. 7. The barque, in putting her helm to starboard, in not backing or easing her sails, and especially in disregarding the order to port her helm, violated all maritime law and usage. 8. The night being dark, the barque should have carried a light. "The want of a lantern in narrow waters," says Jacobsen,[3] "has always been looked upon as such a neglect that against any vessel without a light, the verdict was for re-imbursement of damages sustained. Thus it was decided on motion of Bynkershoeck, in a case pending in the supreme court of Holland. Questiones Jur. lib. 4, c. 22. The same was the verdict of the Rota Fiorentena, May 8th, 1766, in the case of Captain Ramkins, reported by Baldazzeroni." Tom. 2, par. 4, tit. 4, § 38. If the rules of the trinity masters prescribe in this respect any other rule, it is time for our courts to depart from obedience to them in that particular. We have a river commerce, and a commerce in bays and other narrow waters, much greater than that of England: and it is becoming matter of necessity that the court make it obligatory on all vessels to carry lights every where.

Before GRIER, Circuit Justice, and KANE, District Judge.

GRIER, Circuit Justice. Taking all the other circumstances of this case together, and omitting the fact of almost total darkness, and that the barque could see the steamboat while the steamboat could not see the barque, the steamboat would have clearly been held liable for the damages of the collision. It is true there is no law requiring vessels navigating the high seas after night to carry signal lights, and it is much to be regretted that it is not so. But the barque had the wind free, and the tide against her, and she had power, therefore, to give the steamer a wide berth, and to obviate collision. The steamer had three lights; the barque had none. Now, if the steamer had the same opportunity of observing the course of the barque, the latter knowing this fact would have a right to expect a consequent caution on the part of the steamer. But I think it is plain from the testimony, that the light shown by the barque was too late to be of any benefit, or to warn the steamer of its approach, till the very moment of the collision. The warning

[2] [From 4 Am. Law J. [N. S.] 533.]

[3] Jacobsen Seerecht, Altona, 1815, p. 477. "Der Mangel einer Leuchte im engen Fahrwasser ist immer als ein solches Versehen angesehen geworden, dass einem Schiffe ohne Leuchte, Schadensersatz aberkannt ist. So geschah es auf den Antrag von Bynkershoeck in einer vor dem hohen Gerichtshofe von Holland pendenten Sache." Questiones Jur. lib. 4, c. 22. "Eben so wurde erkannt von der Rota Fiorentena, den 8ten Mai 1766, in der Sache des Capitains Ramkins." Baldazzeroni, tom. 2, par. 4, tit. 6, § 38.

given of the approach of the barque by her sails intercepting the light from the lighthouse, like that of the lamp from the barque, was also too late, as well as too uncertain to justify the steamboat in taking any other mode of escaping collision than those she did take. The order to starboard the helm before stopping the boat, and reversing her engine, may have been wrong, and it may be true that these latter orders were not fully executed at the time of the collision. It may be true, also, the order of the barque to starboard her helm, and disregard that of the steamboat captain to port it, was correct, and the only way of avoiding a collision which would have destroyed the barque. But these considerations cannot affect the case. It was the fault of the barque, and not of the steamboat, that the vessels were brought into such proximity that such mistakes might be made in the dark, when the pilot of the steamboat could neither judge of the distance between the approximating vessels, the rates of their approach, nor the relative angle of their respective courses. It was the duty of the barque, which could see, to give a wide berth to the boat, which could not see, and not to leave it in the power of her pilot, by a mistake in a moment of surprise, to cause a collision. The rule of passing to the right, or porting the helm, in cases of vessels meeting on the same line, is founded on the supposition, that each party can see the other. But where one is blind, and the other knows it, he should not put himself within reach of injury by any mistake of the blind, or run over him or knock him down for not observing the rule. The court cannot establish any rule to bind vessels navigating the high seas after night to carry signal lights; but where one party does this, and the other does not, we can and will treat (in a case caeteris paribus) the dark boat as the wrong doer, and liable to make reparation. In rivers and narrow channels, and in harbours, there are generally local regulations requiring it. But if there be not, it would still be advisable for vessels sailing either in close or open channels, to keep proper lights if they wish to seek the courts, in case of collision.

KANE, District Judge. The rules of navigation which we derive from the trinity masters, apply to all cases of apprehended collision, and they are so convenient in practice as to make us most unwilling to relax their application. But to make them applicable at all, there must be reason for apprehending collision, as well as a possibility of escaping it without encountering some greater peril; they cannot be invoked therefore where obedience to the rules has been made impracticable or dangerous by the fault or carelessness of the other party. There is no law which requires vessels navigating the high sea after dark to carry signal lights, and very much it is to be regretted. I can imagine no locality so remote or unfrequented

as to dispense with the policy of such a practice. There is hardly a month that we do not read speculations about missing ships, especially ships navigating along our coast, and almost every old seaman can tell of encounters in the night with vessels that were run down and disappeared, leaving no memorial behind them. I should be very glad to follow in the wake of the first admiralty judge, who would hold the absence of a properly placed and well trimmed lantern to be prima facie evidence of a culpable want of caution. [In our narrow waters, however, a sense of danger has enforced upon our navigation the adoption of something like a general usage, and the legislatures of some of the states have, in reference to steamers at least, made it the subject of enactments. Thus it seems to be universally understood, that a vessel approaching another in a dark night, should show a light, or, in more accurate words, should show such a light, and in such a place as to indicate at least her position, if not her course. The act of congress of 7th July, 1838 [5 Stat. 306], § 10, which requires steamers to carry one or more lights after sunset, is practically almost inoperative for want of specifying their number and position. Our Pennsylvania act of assembly of 30th April, 1844, is little better; it directs a steamer to carry one signal lantern at least 10 feet above the deck,—an imperfect provision, since it omits a description of the sort of lantern and obviously does not affect to indicate the steamer's course. The New Jersey statute is better than these. It requires steamers to carry two signal lanterns, one at the bow near the deck, the other aloft amidships; a much better provision than either would be that which some of our seagoing steamers have adopted in practice from the British rule, according to which, three lights of different colors are carried at the bow and on the wheel-houses.][4] Indeed, so important is some such regulation as this esteemed among the navigators of our river and bay, that I have been solicited more than once to assume its existence and enforce its observance. I would cheerfully do so, if I could find it among the ordinances of any legally constituted tribunal,—the directions of the port wardens for instance, who have in some respects the supervision of our river navigation,—or if the practice recently introduced by our seagoing steamers, were to a considerable extent recognised by others. For the present I confine my action in the matter to the two classes of cases for which statutory provision exists, or generally known usage.

The evidence in this case of collision is not reconcilable as to the circumstances that immediately preceded it. The steamer was on her way to sea with her signal lanterns in place, heading for Henlopen lights. The barque, without any lights, came into the

[4] [From 4 Am. Law J. (N. S.) 533.]

capes from the eastward, with the wind free to pass up the bay. The sails of the barque shut out the Henlopen lights from the pilot of the steamer. The barque was at this time of course heading to the starboard of the steamer's wake. The proper manoeuvre on the steamer's part at this time, was by an inclination of her helm to starboard, so as to keep out of the barque's track. This manoeuvre she executed, but the barque having executed the same manoeuvre at about the same time, the two vessels approached each other. The difference between them was however in this, that the steamer exhibiting signal lights, her position and course could be well understood by the barque; but the barque exhibiting no lights, and having been last seen when heading to starboard of the steamer's wake, the steamer had no means of ascertaining the barque's approach and no cause for apprehending a collision. A light was shown on board the barque very shortly before the collision took place. But whether it was or was not exhibited early enough to make it strictly possible for the steamer to avert the accident, is not with me an important inquiry. The steamer had her full complement of lights, and it was impossible that the barque could have incurred any hazard at all, if she had been content to hold her course, instead of luffing up as she did across the steamer's bows, obviously for the purpose of keeping well up to windward. Had she had lights, she might have done so with safety. Having none, she voluntarily took the risk of the collision, and must reap its fruits.

Decree accordingly.