## THE FANWOOD.[1]

### THE WASHBURN.

*(District Court, S. D. New York. January 5, 1886.)*

COLLISION—FERRY SLIP—TUG AND FERRY-BOAT—DUTY TO YIELD THE RIGHT OF WAY.

The tug W., with a schooner in tow, in passing up the Jersey shore, went opposite and near to the Communipaw ferry slips, so as to obstruct the entrance of the ferry-boat F., which was approaching her slip, and was about one-quarter of a mile distant. Both kept on, and the ferry-boat collided with

---

[1] Affirmed on appeal to the circuit, July, 1886, no opinion being filed.

the schooner at the upper end of the slip. *Held,* that both were in fault: the tug, for not keeping out of the way, as she might have done, having the ferry-boat on her starboard hand; the ferry-boat, because the course and intent of the tug were apparent, and her timely signal of two whistles, indicating her intent to cross, ought to have been perceived by the ferry-boat, and because she had no right to persist in her course at the expense of collision, when she might have avoided it after the tug's intent was clear.

In Admiralty.

*Wilcox, Adams & Macklin,* for libelant.

*De Forest & Weeks,* for the Fanwood.

*Hyland & Zabriskie,* for the Washburn.

BROWN, J. On the thirtieth of December, 1884, between 11 and 12 o'clock in the forenoon, as the ferry-boat Fanwood was approaching her slip at the Central Railroad, New Jersey, she came in collision with the libelant's schooner Mediator, in tow of the tug Washburn, upon a hawser about 80 feet in length. Either from the rebound of the blow, or from the forward motion of the ferry-boat, the bow of the schooner was carried a little towards the shore, so that her bowsprit came in contact with the side of the pier which forms the upper rack, a few feet from the end of the pier. This circumstance establishes beyond dispute the place of the collision.

The tide was strong ebb. The Mediator had been taken in tow by the Washburn a short distance below the Communipaw ferry, and was bound for the Hoboken coal docks. According to the evidence of the libelant's witnesses, and the witnesses for the Washburn, she was making about two or two and one-half knots per hour against the ebb-tide, and was coming up about 200 or 300 yards off the ends of the piers below the ferry. The pilot of the Washburn, when a little below the ferry, suddenly observed a ferry-boat (the Communipaw) coming out of the slip, without sounding, as he says, any previous long whistle, as she should have done. Being but a few hundred feet below, and unable to cross her bows, the tug, though having the right of way, was obliged to give a sharp sheer to the westward, and pass under the stern of the ferry-boat, in order to avoid a collision. This brought him much nearer to the ferry slips. Before passing astern of the out-going ferry-boat he had observed the Fanwood in mid-river, coming west, and gave her two whistles, but heard no reply. After the Communipaw had passed ahead of him he again gave the Fanwood two whistles, but heard no answer. Being then opposite the slip which the Fanwood would enter, he rang his jingle bell to go ahead as fast as possible. At the last signal the Fanwood was estimated to be one-quarter of the distance across the river.

The witnesses on the part of the Fanwood testify that they heard no whistles from the tug; that they passed the out-going ferry-boat from one-third to half way across the river; that they gave four signals of one whistle each, but heard no whistles from the tug, except several short blasts, just before the collision, as a signal to the

schooner to drop the hawser. There is considerable conflict in the details testified to by the ferry-boat's witnesses, and they cannot be harmonized. In general, they state that the first whistle was given about mid-river; the second, about one-third of the way from the Jersey shore; the third, when from 600 to 900 feet from the shore; and the fourth, when about 200 feet from the shore. The pilot and the engineer differ altogether as to the signals to slow and stop and reverse; the pilot stating that they were given at different times, with considerable intervals between them; that the slow bell was given between the second and third whistles; and that he stopped the engine at the third whistle, and backed at the fourth. The engineer testifies that the whistles came all together, within a second of each other.

The testimony of several disinterested witnesses establishes beyond doubt the fact that the two signals of two whistles were given by the tug as her witnesses state; and that the last signal of two whistles was given when the tug was already opposite the slip. Had the Fanwood been giving any proper attention to the tug, the latter's whistle would have been heard or seen, since the tug could not at that time have been much over a quarter of a mile distant. This is evident from the place of collision, and from the known speed of both boats. At the time of collision the bow of the tug must have been about 120 feet above the end of the upper rack. The Fanwood was proposing to enter the middle of the three divisions which formed the ferry slip, and the lower part of that division was somewhat less than 200 feet below the upper pier. The tug made only about 300 feet, therefore, from the time she began to lap the middle division of the slip. She was making only from two to two and one-half knots against the tide, while the ferry-boat was crossing at about the rate of twelve knots, or about five times the speed of the tug. The Fanwood was consequently about 1,500 feet, or a quarter of a mile, distant from her slip when the tug was plainly beginning to obstruct her entrance.

Under these circumstances, there was no excuse for this collision on either side. It was equally in the power of the tug and of the ferry-boat to avoid it. The tug, having the ferry-boat on her starboard hand, was bound to keep out of the way; the ferry-boat had the right of way. The tug, though she twice signaled her intention to cross the ferry-boat's bows, got no answering assent; and by the well-settled rules it was therefore at her own peril and risk that she kept on, instead of giving way to the ferry-boat, as it was her duty to do. *The City of Hartford*, 11 Blatchf. 72; *The City of Chester*, 24 Fed. Rep. 91.

The master of the tug was doubtless acting under some irritation and provocation, since a few minutes before he had himself been obliged to give way to the Communipaw in order to avoid collision, though he had the right of way. But one wrong does not excuse an-

other. Redress for the infraction of the rules must be sought in the penalties prescribed by law, not by running into collisions. If the tug, having been forced to the westward by the Communipaw, had had no other alternative to avoid the Fanwood but to keep on, that would doubtless have constituted an exception, under the twenty-fourth rule; but I cannot find that she was under any such compulsion. After passing astern of the Communipaw she had only to wait about a minute and a half, going under a slow bell, or possibly stopping for a part of the time in the ebb-tide, and she would have given the Fanwood the free course to which she was entitled. There were no other vessels in the way to prevent the tug's stopping her headway for this brief time. Against the tide the tug had full and easy control of her position, and of her movements; and the tug must therefore be held in fault.

The fault of the Fanwood is equally clear, because the course and intention of the tug and tow to cross the slip ahead were obvious to the ferry-boat in time to avoid them by any reasonable effort to do so. As I have said, had attention been given her from the Fanwood, the tug's last two whistles, at least, would have been either heard or seen. But whether the whistles were perceived or not, the tug was already plainly visible, obstructing and crossing the Fanwood's slip, when the Fanwood was nearly a quarter of a mile distant. The ferry-boat could come to a dead stop in the water in less than half that distance. Though the tug was crossing the slip unlawfully, the ferry-boat had no right to run her down when her effort and intention were clearly perceived, and the ferry-boat could easily avoid her. There was nothing to prevent the Fanwood's stopping in time, and giving way to the tug, as the tug had given way to the Communipaw a few moments before, and as it was the duty of both alike to do, rather than run into collision. *Crockett* v. *Newton*, 18 How. 581; *The Warren*, 18 Fed. Rep. 559; *The Frisia, ante,* 249.

The comparatively slow progress of the tug makes it certain that the tug must already have passed the middle division of the slip when the Fanwood was at least from 800 to 1,000 feet distant,—a space more than sufficient for the ferry-boat to have come to a stop in the water before reaching the tug and tow. Her keeping on, therefore, instead of stopping in time, when this obstruction was so plainly in view, could only proceed from a willingness to inflict injury, or gross neglect of timely precautions, or want of attention to the position of the tug and tow; for either of which the Fanwood would be equally culpable. The weight of evidence is clear that the ferry-boat's engines were not reversed till she was very near the tow. The libelant is therefore entitled to a decree against both the tug and the ferry-boat in the usual form, with costs.