## THE FRISIA.[1]

## THE JOHN N. PARKER.

*(Circuit Court, E. D. New York. July 15, 1886.)*

COLLISION—STEAMERS CROSSING—WHISTLES—DUTY TO STOP AND BACK.

    A collision occurred in New York harbor on a clear day, between the steam-ship Frisia, outward bound on a S. S. W. course, and a bark towed by a hawser astern of a tug, which was crossing from Red Hook to a point below Bedlow's island, on a W. N. W.[2] course. The tug blew three signals of two whistles each to the steam-ship, and, receiving no answer, kept on to the westward, and crossed the course of the steam-ship. Those in charge of the Frisia not hearing any whistles from the tug, but seeing it was crossing on a course at right angles, blew one blast of their whistle, ported, and kept on. Receiving no whistle in response, the steam-ship again blew one blast of the whistle, and then reversed, but too late to avoid a collision, and the Frisia's stem struck the starboard side of the bark about 50 feet from her stern. *Held* that, as the tug had the steam-ship on her starboard side, it was her duty to keep the bark out of the way of the steam-ship, and that she was in fault for attempting to cross ahead of the Frisia, and in keeping on without getting a response to her whistles. On appeal, *held,* that the Frisia was also in fault in that, when it was plainly seen that the tug and bark were crossing her course so as to involve risk of collision, she ported her helm, and did not sooner stop and reverse. *Held,* that libelants were entitled to a decree for their damages against both the tug and the steam-ship.

Admiralty Appeal. The decree in the district court in the same case (24 Fed. Rep. 495) *reversed* in so far as it held that the Frisia was not in fault.

In this case the court (BLATCHFORD, Justice) found the following facts:

(1) On June 17, 1882, James Kitchin, James R. Kitchin, Dickson Anderson, and Robert McDonald were the owners of the bark James

---

[1] Reported by R. D. and Wyllys Benedict, Esqs., of the New York bar.

[2] See note, *post,* 250.

L. Harway, her tackle, apparel, etc. The bark was a British vessel, hailing from Pictou, Nova Scotia, built in August, 1880, of 958 tons register, 170 feet keel, 38 feet beam, and 21 feet depth of hold, and was in first-class condition.

(2) On that day she was lying at Merchant's Stores, Brooklyn, in ballast, ready for sea. At 12 o'clock noon she was taken in tow by the steam-tug John N. Parker, to be towed to an anchorage to the south of Bedlow's island, in the harbor of New York.

(3) The tug was about 75 feet long, and was in the business of towing vessels about the harbor of New York. After towing the bark out clear of the stores at Red Hook, she went ahead of the bark, and took her in tow, as customary, on a hawser of 60 fathoms in length, which was fastened at the stern of the tug, and led to the bitts on the top-gallant forecastle of the bark, where it was made fast. The tug then proceeded with the bark directly across the bay, in a W. N. W.[1] direction, by compass, towards her anchorage on the southerly side of Bedlow's island.

(4) The wind at the time was blowing a light breeze from the south-east. The tide was running ebb at the rate of about three knots an hour, in a southerly direction. The weather was fine and clear, and the sun was shining brightly.

(5) The bark had no sail set, and was without propelling power of her own, and was under the sole management, control, and direction of the tug. An able seaman was stationed at the wheel of the bark, as she left the wharf, and was ordered to steer her directly after the tug. He remained at the wheel until after the collision. He steered the bark right after the tug. By his compass his course was W. N. W. The first officer stationed himself on the top-gallant forecastle of the bark, when the tug started to tow, and remained thereon up to the time of the collision. The rest of the officers and crew, except the captain, who was on shore, were about the deck, attending to their respective duties.

(6) The tug was in charge of her captain and pilot, who was an experienced man in navigation, and had a competent and sufficient lookout, and a competent engineer in charge of her engine. The whole length of the tug and tow, with the 60-fathoms hawser, was about 605 feet.

(7) The Erisia was an ocean steamer, of 3,000 tons, schooner rigged, belonging to the Hamburg-American Packet Company, and was employed regularly in their line between New York and Hamburg, carrying freight and passengers. She was 312 feet in length, was built of iron, and had a very sharp bow. She had a screw, which turned to the right, and when her engines were reversed from full

[1] NOTE.—In the district court opinion this course is given as N. N. W. This was probably caused by a mistake of the stenographer in his minutes of the testimony of the captain of the tug. In the additional testimony in the circuit court the captain of the tug testified that this was an error, and that his course was W. N. W.—[REP.

speed ahead to full speed astern, her head turned to starboard, so long as she was making headway, whether her rudder was amid-ships, or she was under a starboard helm, or under a port helm. With her rudder amid-ships, her head would fall off to starboard two points in the time between such reversing of her engines from full speed ahead to full speed astern and the moment at which she ceased to make headway; under a port helm, or under a starboard helm, her head would fall off to starboard one and one-half points in the same time. Under normal conditions of wind and tide, about two minutes would elapse between the reversing of her engines at full speed and the moment at which she ceased to make headway. Her full speed was 13 knots an hour.

(8) About 15 minutes past 12 she left her dock at Hoboken, bound on a voyage to Hamburg, Germany, carrying passengers and cargo. Her navigation was in charge of a Sandy Hook pilot, who, from the time of leaving the dock until after the collision hereinafter mentioned, remained on her bridge. The bridge was more than 160 feet abaft her stem, and was 12 feet above her deck. Her master and her chief officer were also on the bridge, the master standing on the port side, at the telegraph to the engine-room, and the chief officer on the starboard side, at the telegraph to the wheel. The pilot gave the orders for her navigation. She backed out into the stream, and then took her course down the river, along the western edge of the channel, which was her proper course.

(9) After the tug and the bark had passed out to the southward and westward of the Black Buoy No. 1, situated south-west of Governor's island, those on the tug and bark saw the steamer Frisia coming down the river, upwards of a mile away, at a high rate of speed. There were at that time proceeding down the bay, between the steamer and Governor's island, the steam-boat Matteawan, bound from Pier 1, East river, to Bay Ridge; the steam-boat Castleton, bound from the foot of Whitehall street to Staten island; the tug-boat Peter Smith, with a canal-boat in tow, bound from Hoboken to Gowanus creek; and the tug-boat Joseph Stickney, bound from Jersey City to Red Hook. Going up the bay was a large Inman steamer, which crossed the tug's bows, and passed the Frisia on her port hand.

(10) The pilot of the tug, after seeing the Frisia, gave a signal of two short and distinct blasts of his steam-whistle, to indicate to the Frisia, that the course of the tug and the bark was to the westward, across the course of the Frisia, but the latter made no reply. The tug thereupon repeated the signal of two short and distinct blasts of her steam-whistle, but the Frisia gave no reply thereto, and thereupon the tug, for the third time, gave a signal of two short and distinct blasts of her steam-whistle. The reason why the pilot of the tug gave the above signals was that he thought that, by keeping on, he would cross with the bark in safety before the Frisia would reach the

course of the bark, and therefore he kept on. No whistle from the tug was heard by any one on board of the Frisia. After the tug had opened the starboard side of the Frisia those on the tug heard two whistles blown from on board of the Frisia. These were the first whistles heard from the Frisia by those on the tug, and before that the Frisia had not blown any whistle.

(11) The course of the tug and the bark was not changed, and their speed was about six miles an hour, until just prior to the collision, when the speed of the tug was increased to her full power, to avoid a collision. The Frisia, with her stem, struck the bark a blow on her starboard side, between the two after-shrouds of the starboard main rigging, about 50 or 60 feet forward of the stern of the bark, which cut into the bark's side to within a few feet of her keel, and the stem of the Frisia was thereby so firmly wedged into the side of the bark, that she could not back out, or free herself from the bark, until five steam tugs had pulled the bark away from her, which was done. The water then began to pour rapidly into the side of the bark, and the tugs towed her to the Red Hook flats, where she sank immediately, with everything on board. The time of the collision was shortly after half past 12 o'clock; the place, S. E. by S. from Bedlow's island.

(12) The distance from the Frisia's dock at Hoboken to the place of collision is three and one-fourth miles. The Frisia backed out from her dock at 12:15 P. M. She rounded and started down the river at full speed at 12:22 P. M. She stopped her engines and reversed them at 12:35, but too late to overcome her headway before she struck the bark. She was running at full speed ahead, with the tide, up to the time she reversed.

(13) The course of the Frisia was S. S. W. Her pilot and her first officer, on the bridge, saw the tug and the bark, on the port bow of the Frisia, from one-half to three-quarters of a mile away, and saw that they were bound to the westward, across the course of the Frisia. When they saw that the tug was taking no measures to avoid the Frisia, and was determined to cross her course, the pilot ordered the first officer to blow one blast of the steam-whistle, and one short blast was then blown, and the helm of the Frisia was ported, and she continued on at full speed. This whistle was not answered by those on the tug. After an interval the Frisia blew another blast of her steam-whistle, and about the same time the pilot of the Frisia gave orders to put the wheel amid-ships, stop the engines, and reverse, full speed astern, but before the headway of the Frisia was overcome, she struck the bark.

(14) The following rules and regulations, among others, for the government of pilots of steam-vessels, as revised, amended, and adopted by the board of supervising inspectors, as authorized by the act of congress to provide for the better security of life on board of vessels propelled in whole or in part by steam, and for other purposes, were

in force at the place of this collision, and applicable to the proper navigation of steam vessels, at the time of this collision, viz.:

"Rule 1. When steamers are approaching each other 'head and head,' or nearly so. it shall be the duty of each steamer to pass to the right, or port side, of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give, as a signal of his intention, one short and distinct blast of his steam-whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam-whistle. and thereupon such steamers shall pass to the right, or port side, of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head,' or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam-whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam-whistle, and they shall pass to the left, or on the starboard side, of each other."

"Rule 3. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage-way until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

"Rule 6. The signals, by the blowing of the steam-whistle, shall be given and answered by pilots, not only when meeting 'head and head,' or nearly so, but at all times when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

"N. B. The foregoing rules are to be complied with in all cases except when steamers are navigated in a crowded channel, or in the vicinity of wharves; under such circumstances steamers must be run and managed with great caution, sounding the whistle as may be necessary to guard against collision or other accidents."

(15) The libelants, as between themselves and the tug, sustained by the collision damages in the sum of $35,844,40, as reported by the commissioner, with interest on $28,274.09 from August 1, 1882.

And the court also found the following conclusions of law:

(1) The courses of the tug and the Frisia being crossing courses, involving risk of collision, and the tug having the Frisia on her own starboard side, it was the duty of the tug to keep the bark out of the way of the Frisia.

(2) The tug committed faults leading to the collision, in that she attempted to cross ahead of the Frisia with the bark, and in that, after getting no response from the Frisia to any one of her whistles, she kept on, and did not stop or reverse.

(3) The Frisia committed faults leading to the collision, in that she ported, and did not starboard, when it was plainly seen by those in charge of her that the tug and the bark were crossing her course, so as to involve risk of collision, and in that she did not sooner stop and reverse.

(4) The libelants are entitled to decree against the Frisia and the tug, and their respective stipulators severally, each for one-half of the

entire damages of the libelants, and of the proper interest thereon, and of their costs in the district court, and in this court, so far as the stipulated value of the vessel shall extend; any balance of such one-half, over and above such stipulated value of either vessel, or which the libelant shall be unable to collect or enforce, to be paid by the other vessel or her stipulators, to the extent of the stipulated value thereof, beyond the moiety from said vessel.

*H. T. Wing* and *H. Putnam,* for libelants, James Kitchin and others.

*T. E. Stillman* and *W. Mynderse,* for the Frisia.

*R. D. Benedict,* for the John N. Parker.

And the court also rendered the following opinion:

BLATCHFORD, Justice. The district judge condemned the tug, and acquitted the Frisia. 24 Fed. Rep. 495. He held that, it being the duty of the tug to avoid the Frisia, she was in fault in attempting to cross the Frisia's bows. As to the Frisia, he held that the whistles of the tug were all of them blown when the Frisia was so close at hand that stopping and reversing her engines was the only thing then to be done by her towards avoiding a collision; and that, in the absence of timely whistles from the tug, the Frisia was not chargeable with knowledge of the intention of the tug to attempt to cross the bows of the Frisia. The district judge said: "If, notwithstanding the omission of the tug to give timely notice by her whistle, the circumstances were such as to inform the steamer in time that the tug was intending to cross her bows, such circumstances cast upon the steamer the duty, by a timely change of her course, or slacking of her speed, to avoid the danger attending the course selected by the tug. I find in the circumstances proved nothing calculated to convey such information to the steamer."

The course of the Frisia being S. S. W., and that of the tug being W. N. W., it was necessarily apparent to those on the Frisia that the tug was crossing the course of the Frisia at right angles. Again, the answer of the Frisia says that the bark in tow of the tug "was apparently bound from a point near Merchant's Stores, Brooklyn, to a point a little to the southward of Bedlow's island," and that the collision occurred "to the southward and eastward of Bedlow's island." The answer also says, as to the Frisia:

"Those in charge of her navigation first saw the tug John N. Parker, and the bark James L. Harway in tow thereof, about three points or more on the port bow of the steam-ship, and distant three-quarters of a mile. The Frisia continued upon her course, which was about S. S. W., and those in charge of her navigation, seeing that the said tug and bark were taking no measures to avoid the steam-ship, though it was their duty so to do, blew a single blast of the steam-whistle to call the attention of the tug and bark to their duty, and to warn them to go under the stern of the steam-ship. The said signal was unheeded by the tug and bark, and they continued, at undiminished or at increased speed, on a course crossing the course of the Frisia, ahead of the Frisia."

It is also apparent from the testimony of the chief officer and the pilot of the Frisia that they saw all the time that the tug was on a course crossing the bow of the Frisia, and was intending to cross her bow, and that they thought the Frisia could do no harm by keeping on. Under these circumstances, the duty of the Frisia, under rule 21 of section 4233 of the Revised Statutes, to at least slacken her speed much sooner than she did, was plain. If she had done so, she would have gone astern of the bark.

As the district court ordered a reference as to damages only as against the tug, and the claimant of the Frisia was no party to the proceedings on that reference, there must be a new reference as to damages in this court, to be conducted on notice to all three of the parties.