## THE CITY OF SAVANNAH.[1]

### LEWIS et al. v. THE CITY OF SAVANNAH.

(*District Court, S. D. New York.* March 28, 1890.)

1. COLLISION—FAILURE TO SHOW LIGHTS—MUTUAL FAULT.
   Though, in a case of collision by night, the vessel failing to show the statutory lights must be held in fault, that does not relieve the other vessel, if, under the same circumstances, she would have been held liable **before** the introduction of the laws requiring lights.
2. SAME—FLASH-LIGHT—OVERTAKING VESSEL—NEGLIGENT LOOKOUT.
   The schooner L. was coming up the Atlantic coast, near the port of New York, heading nearly for the Scotland light-ship. The night was overcast and dark, but the atmosphere was clear. A steamer's lights were seen astern of them by those on the sailing vessel several minutes before the collision which ensued between the two vessels. No torch was shown by the sailing vessel, and she was not seen by the steamer until the latter was within a few feet of her. *Held*, that both vessels were in fault for the collision,—the schooner, for not exhibiting a torch; the steamer, for not sooner observing the sailing vessel.

In Admiralty. Action for damage by collision.
*Goodrich, Deady & Goodrich*, for libelants.
*Hoadly, Lauterbach & Johnson*, for claimants.

BROWN, J. On the night of March 30, 1889, about six miles south-east of the Highland lights, the libelants' three-masted schooner L. A. Lewis, coming up the coast, was overtaken and run into by the steamer City of Savannah, and badly damaged. The night was overcast and dark, but the atmosphere was clear, with the wind about W. N. W. Both were heading nearly for the Scotland lightship,—the City of Savannah directly for it; the schooner, with her booms to starboard, keeping the light just a little on her port bow. The schooner was therefore slightly crossing to starboard the line of the steamer's course. The steamer's stem struck the stern of the schooner about 20 inches on the port side of the rudder, and carried away the schooner's stern quarter. The schooner showed no stern or flash light, and she was not seen by the steamer until the latter was within a few feet of her. Collision occurred at the moment when the order to stop was given. The libel alleges that the steamer, when first seen, showed her red light only, a little on the schooner's starboard quarter; that the steamer afterwards changed her course so as to show both colored lights, whereupon the master went to the cabin to get a torch-light; but that, before it could be procured and shown, collision occurred. The master was drowned.

The evidence is not sufficient to establish any change of course by the steamer. The weight of proof, in that respect, is with the claimants, that there was no change. If only the steamer's red light was first visible, the two colored lights afterwards came in view, probably, because the schooner was slightly crossing the line of the steamer's course to starboard, and by reason of the schooner's leeway in the strong north-west

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

wind. The fault of the schooner is clear. The steamer was plainly an overtaking vessel. She was more than two points abaft the schooner's beam; being nearly astern on her starboard quarter. The schooner could not know, and had no right to act upon the guess or assumption, that the steamer was moving off more to leeward. The contrary was the fact; and she was bound to show, even to the red light, a white light or a flare-up light, under rule 2. The libelant's evidence shows, however, that the steamer's two colored lights were seen some three or four minutes before collision. It was manifest negligence in the schooner not to have at least a lantern ready to be exhibited at once, and not to show it in much less time than three or four minutes.

The principal difficulty in the case relates to the liability of the steamer, and whether she, also, ought to be held to blame for not seeing the schooner sooner, notwithstanding the absence of any stern light, and in time to avoid her. The steamer's speed was about 13 knots; the schooner's, according to the estimate of her mate, about 2 knots; according to the claimant's estimate, 7 or 8 knots. As all the witnesses agree that there was a good breeze, the wind from one to three points free, and all the schooner's lower courses drawing, I cannot doubt that the schooner was making some 4 or 5 knots. The steamer was overtaking the schooner, therefore, at the rate of about 8 or 9 knots per hour, or 800 or 900 feet per minute. It is to be observed, first, that the relative positions and courses of the two vessels were the easiest possible for avoiding collision. The second officer of the steamer says that 8 or 10 turns of the wheel, 100 feet away, would have been sufficient to clear her. Not to hold the steamer to so narrow a space as that, if the schooner had been seen and reported at three times that distance,—300 feet,—the steamer would have had to travel over 450 feet before reaching her, which she would have done in about 20 seconds. That was time enough and space enough for the steamer to sheer a couple of points; and a change of a single point, 150 feet away, would have cleared her easily.

Am I justified, upon the evidence, in holding that the night was such that the schooner could not have been seen by a reasonably vigilant lookout 300, or 400, or even 500 feet distant? On the steamer there was a seaman at the bows; also the second officer pacing the forecastle deck athwartships, and the master standing by the wheel. All claimed that they were keeping a sharp lookout; that they all saw the schooner at the same time, when right upon her, and only about 20 or 30 feet distant. The master says he could see the lookout stationed in the bows, 30 feet distant from the wheel. The schooner was a large object. The surface of her sails, and not merely their edges, were presented to view. The mainsail and foresail were new and white. The second officer says that the loom of a schooner without a light may sometimes be seen, "on a cloudy night without stars, for a mile, or a mile and a half, when the night is not too dark." Five nautical experts were called by the libelants, who all testified that, on a night such as the claimants describe this to have been,—overcast, cloudy, and without stars, but with a clear atmosphere, without haze or mist,—sailing vessels would have been seen by

a good lookout from a quarter of a mile to three-quarters of a mile distant. Opposed to these, no disinterested witnesses were called by the claimant; but only the persons on board the steamer, who are always liable to be more or less swayed by their bias and prepossessions; and they say that they kept a good lookout, and could not see the schooner earlier. The case on their part, however, rests mainly on the testimony of the single seaman who was forward. For the second officer states that he was traversing the deck back and forth, looking out while doing so; but at the moment when he saw the schooner he had just stopped amid-ships, and looked forward and saw her. The court, not having the benefit of official nautical experts sitting as associates on the trial of such questions, must rely upon the testimony of persons specially called as expert witnesses, in conjunction with the knowledge derivable from experience and the history of maritime causes.

Considering this state of the evidence, the long history of navigation, the laws and usages of the sea, the prior adjudications, and that no expert navigators have been called by the claimants to break the force of the testimony of the libelants' experts, I am satisfied that the weight of the proof and probability is with the libelants; that the schooner ought to have been seen in time to avoid her, and a stricter watch maintained. It was not until 1858 that the use of a signal light at sea was made obligatory on sailing vessels. 1 Pars. Shipp. & Adm. 556, note. For centuries before that time, navigation had been carried on without the use of signal lights; and vessels often approached each other in dark nights at a much greater rate of speed, and more dangerously, than these were doing. Collision was ordinarily avoided by a vigilant lookout ahead; and although the carrying of lights, except under special circumstances, was not obligatory until made so by the recent statute and international rules, sailing vessels recovered their full damages against steamers for collision in dark nights, though no lights were exhibited. *The Rose,* 2 W. Rob. 2; *The Columbine,* Id. 27; *The Iron Duke,* Id. 377; *The Londonderry,* 4 Notes Cas. Adm. & Ecc. Supp. 31. See *The Louisiana,* 21 How. 1; *The Neptune,* Olcott, 496; *The Parkersburgh,* 5 Blatchf. 247. In *The Osprey,* 2 Wall. Jr. 268, the vessels were approaching each other faster than these, and it was distinctly proved that the bark was no sooner discoverable. In *The Sarmatian,* 2 Fed. Rep. 911, the schooner was a small oyster craft. Only the flat edges of the sails were presented to the steamer. There was no cabin light. There was a slight haze over the water; and apparently no point was made or proof given as to whether the steamer could have perceived the schooner earlier; and the court found she could not. The statutory requirement to show a light was not designed to admit of relaxed vigilance in the lookout, or to justify it; and, though now the vessel not showing the required light must be held in fault, that does not relieve the other vessel, if, under the same circumstances, she would have been held liable before the statutory rules. *The Helen Mar,* 2 Low. 40-44; *The City of Merida,* 24 Fed. Rep. 233, 234. The distance at which vessels can be seen at night is a matter of frequent testimony in maritime courts. On moonlight nights, sailing vessels without lights are seen two or three

miles distant. See *Baker* v. *The City of New York*, 1 Cliff. 84. When the sky is overcast, and without moon or stars, they are only visible, of course, within a much less distance; but the inference to be derived from ordinary experience, from numberless reports of cases and from the trial of causes, is that it is only in thick or hazy weather that vessels ahead, and without lights, cannot be seen at all, or until within the distance of a few feet. At this time there was no thickness of the weather. It was merely cloudy, with an overcast sky, without moon or stars. Such nights, with a clear atmosphere, would not prevent seeing objects at a moderate distance. *The Columbine*, *supra*; *The Parkersburgh*, 5 Blatchf. 247; *The Saratoga*, 37 Fed. Rep. 120. The testimony of the experts, that in such a night the loom of.a vessel ahead would be perceived at least a quarter of a mile distant, accords with frequent testimony of a similar effect in other cases. One-third of that distance was more than sufficient to enable the steamer to avoid this schooner. The claimants, if not satisfied with the judgment of the five nautical experts, should have called other disinterested experts to rebut that testimony. I cannot disregard it. The schooner, moreover, had a light burning in her cabin; and there was evidence that that light could be seen a mile astern, through the cabin windows, and had been seen that distance by the witness in following the schooner out of Mobile bay. A tenth part of that distance would have been more than enough warning to avoid the schooner. I must therefore hold the steamer also to blame. Decree for the libelants for one-half of the damages and costs.