## THE CHICAGO.[1]

### THE VOLUNTEER.

### MURRAY et al v. THE CHICAGO.

### PENNSYLVANIA R. CO. v. THE VOLUNTEER.

#### (District Court, S. D. New York. May 14, 1894.)

**COLLISION—STEAM VESSELS CROSSING—FERRY SLIP—INSPECTORS' RULE III—LOOKOUT—SIGNALS.**

A tug with a tow alongside was going up the North river close to the New York shore, and approached a ferry slip. A ferryboat, bound for the slip, crossed from the New Jersey shore. The evidence was conflicting as to signals, the ferryboat asserting that when 300 yards distant she gave two whistles to the tug, and received a reply of two, after which no attention was paid to the tug until near the slip; the tug asserting that she neither heard nor gave any signal of two whistles, but that, when the ferryboat was a third of the way across the river, the tug gave a signal of one whistle, to which no answer was received. *Held*, that the tug was in fault for navigating too near the ferry slip and embarrassing the ferryboat, and for not giving an alarm signal on receiving no answer to her own signal; that the ferryboat was in fault for failing to keep a proper lookout after giving her own signal, and hence for failing to observe the attempt of the tug to go across her bow in time to reverse; and that the damages should therefore be divided.

These were cross libels by John Murray and another against the ferryboat Chicago, and by the Pennsylvania Railroad Company against the tug Volunteer, for damages from a collision between the ferryboat and a scow in tow of the tug.

Robinson, Biddle & Ward, for the Chicago.
Goodrich, Deady & Goodrich, for the Volunteer.

BROWN, District Judge. At about 6 p. m., after dark, on the evening of November 28, 1893, as the ferryboat Chicago, from Jersey City, was about to enter her slip at the foot of Cortlandt street on the ebb tide, she came in collision with a loaded sand scow, which was lashed to the starboard side, and in tow of the

[1] Reported by E. G. Benedict, Esq., of the New York bar.

tug Volunteer, which was going up the North river just outside the line of the piers.

The testimony of the pilot of the ferryboat shows that after he had given his first signal of two whistles to the tug when some 300 yards distant, and received, as he says, a reply of two whistles from her, he did not pay any further attention to the tug and tow until he was within a boat's length of Starin's pier, which is at the entrance of the Cortlandt street slip; that he then saw that the Volunteer was coming up in front of him, and that there would be a collision which he could not avoid. To escape the strength of the ebb tide, the tug came up nearly in line with the end of Starin's pier, which was longer than the piers below; and she was proceeding quite slowly. The testimony as to the whistles given, is directly contradictory. The pilot of the Chicago says he gave to the tug a signal of two whistles and got an answer of two, when 300 yards out in the river. The pilot of the tug, and one other witness, testify that they heard no such signal from the ferryboat until she was close to the pier; that the tug at no time gave any signal of two whistles; but that she did give a signal of one whistle to the ferryboat when the latter was a third of the way across the river, to which no answer was received; and that the tug gave no other signal before collision.

The preponderance of witnesses is in favor of the ferryboat, as to the signal of two whistles. I do not see much difference as regards the probabilities of the case. If it is improbable that the tug, had she given two assenting whistles to the ferryboat's signal of two whistles, would have kept on directly under the bows of the ferryboat, contrary to her agreement, and to the manifest danger of her own destruction, it is equally improbable that the ferryboat, after giving a signal of two whistles to the tug, should pay no further attention to the tug, had the tug given her a contrary signal, or no signal at all. I do not undertake to balance these probabilities, or to determine just what the fact was in regard to these signals. For, aside from the question of signals, there are other facts that put each in fault.

The tug was in fault for having no separate lookout; for proceeding so near to the New York shore, to the embarrassment of the ferryboat in entering her slip; for attempting to go ahead of the ferryboat at the mouth of her slip, when she could not do so without embarrassing the ferryboat's entrance; and for violation of the inspector's rule III, in not giving several short and rapid blasts of her steam whistle when she received no response, as her pilot says, from the ferryboat, to her signal of one whistle, and therefore had no certain understanding as to the course or intention of the ferryboat, but relied instead upon the surmise that the ferryboat would wait for the tug.

The ferryboat is in fault for paying no further attention to the tug, incumbered as she was by her tow, after the signal of two whistles, until the tug was so near that collision was unavoidable. Even if she got a reply of two whistles from the tug, and had a

right to expect that the tug would go under her stern, in accordance with that signal, she was not thereby absolved from the duty of attention to the movements of the tug until she got so near that collision was inevitable. Misunderstanding of signals is not infrequent; the execution of intentions is sometimes interrupted, or thwarted by new circumstances. The necessity and the duty to maintain a good lookout continue the same. The design of the rules for signals is not to make them a substitute for a continued lookout, but to add to the previous means of safety against danger, of which a good lookout is the chief. The City of Savannah, 41 Fed. 891; The Clara, 49 Fed. 767; The Ice King, 52 Fed. 896.

Had proper and reasonable attention been given to the tug, it must have been seen that she was not navigating in accordance with the supposed agreement of two whistles, which the pilot of the ferryboat testified that he understood were given by her. The failure of the tugboat to turn to the left, as such signals would have required, or to check her progress towards and across the mouth of the slip, were so evident an indication of some misunderstanding or of an intention to pass ahead of the ferryboat, that had a proper lookout been kept, they must have been observed in time to enable the ferryboat either to repeat her signals, or give a timely danger signal, as in such a case she ought to have done, or else to stop and back, as she also might have done, in time to avoid the collision, notwithstanding the tug's prior faults. The case is, in this respect, like those of The Fanwood, 28 Fed. 373, affirmed on appeal; and The Baltimore, 34 Fed. 660, affirmed 38 Fed. 367; The Frisia, 28 Fed. 249, 24 Blatchf. 40; The John S. Darcy, 29 Fed. 644, affirmed 38 Fed. 619.

The damages must, therefore, be divided.