THE CLINTON.

THE ALFRED W. BOOTH.

(District Court, S. D. New York. November 3, 1899.)

COLLISION—NEGLIGENCE—RIGHT OF WAY—TWO TOWS—CROSSING BOWS.

The C., a ferryboat, crossing from her New York slip to her Brooklyn slip, where the river was but 1,400 feet wide, and heading nearly directly across, when it had gone one-third the distance, sounded a single blast to the tug W., and a tandem tow, and the tug B., which had a dumper lashed to it, both of which were proceeding down river on the Brooklyn side, against the flood tide, with the C. on their starboard hand, to which the W. replied with one, turned somewhat to the starboard, and passed under the stern of the C. The B. did not answer, nor follow the course of the W. When in midstream, and before the W. had passed under her stern, the C. gave another blast, and then, getting no answer, gave a third signal of one whistle. The C. cleared the W. by a few feet, and immediately stopped, and backed or turned to starboard. Held, that the B., which was bound by the rules of the road to stop or turn to starboard, and which could have done so and avoided the accident, was in fault; and that the C. was not in fault, it having had a right, in the first place, to proceed on its course, both tugs having then time and space to keep out

of her way, and it having later been unable to stop sooner than it did, without a collision with the W.

In Admiralty.

Cowen, Wing, Putnam & Burlingham, for libelant.
James J. Macklin, for the Clinton.
Robinson, Biddle & Ward, for the Alfred W. Booth.

BROWN, District Judge. At about 7:30 a. m. of March 12, 1899, as the ferryboat Clinton, of the Catherine ferry, was crossing from her New York slip to her slip in Brooklyn in the strong flood tide, she came in collision off her lower Brooklyn slip, about 100 or 200 feet distant therefrom, with the libelant's dumper No. 7, which was lashed on the starboard side of the tug Alfred W. Booth and proceeding down river about parallel with the New York shore. The above libel was filed to recover the damages to the dumper.

The ordinary course of the ferryboat from the New York slip to the Brooklyn slip on the flood tide, is naturally a nearly straight line, heading about two or three points to port of a line directly across the river; and I have no doubt that this was the general course of the Clinton on this occasion, as her officers state, and that the witnesses from the Booth are in error as to the course of the Clinton. Before the Booth, which was proceeding down near the Brooklyn shore, had got abreast of the Brooklyn slip, the tug Woodruff came out from the dock at the foot of Washington street, two blocks above the ferry on the Brooklyn side, with two barges in a tandem tow on a hawser of about 30 fathoms, and heading a little down river, crossed in front of the Booth, and passing outside of her, turned and headed nearly straight down river. The Clinton, being at that time about one-third the way across from the New York shore, sounded to both tugs a signal of one whistle, to which the Woodruff replied with one, turned somewhat to starboard and passed under the stern of the Clinton. The Booth did not answer, nor follow the course of the Woodruff. When in midriver, and before the Woodruff had passed under her stern, the Clinton gave another signal of one whistle to the Booth, and still getting no answer from the Booth gave her a third signal of one whistle, which she answered with one, followed immediately by an alarm. The Clinton cleared the Woodruff and her tow by only a few feet, the latter passing under her stern; and as soon as she was clear of them the Clinton stopped and backed; but the Booth not having stopped or turned to starboard as the Woodruff had done, collision followed as above stated, about abreast of and near to the lower slip. At the time of the collision the stern of the ferryboat was not more than 20 or 30 feet from the tow of the Woodruff, which was passing under her stern.

The primary fault of this collision undoubtedly rests with the Booth, which had the Clinton on her own starboard hand and was bound by the rules of the road either to stop, in order to allow the Clinton to enter her slip, or else to turn to starboard and go under her stern, as there was nothing in the position of the Woodruff to prevent that course from being taken. Instead of doing either, the

Booth turned somewhat to port, instead of to starboard, and approached nearer the Brooklyn shore. The first signal of the Clinton was heard by the pilot of the Booth, from which he understood, or ought to have understood, that the Clinton intended to go ahead of both boats in accordance with her own right of way. He says he expected to see a collision with the Woodruff. That signal was as much for the Booth as for the Woodruff; and it bound both alike to act in conformity with it, as the Clinton, being on their starboard hand, had the right of way. I see no excuse for the Booth's neglect of her duty in this situation. She was some distance above the ferry slip at the first signal, and in moving against the flood tide would have had no difficulty in keeping out of the way of the ferryboat, as she was bound to do, had she adopted suitable measures in time.

Had not the Woodruff and her tow been present, the other circumstances would, perhaps, have been sufficient to have charged the Clinton with fault in not stopping and backing earlier than she did; because when the Clinton had arrived in midstream, or a little before that, there was obviously great danger of collision with the Booth and doubt whether the Booth could then avoid her, the river being there but 1,400 feet wide from pier to pier. The Fanwood (D. C.) 28 Fed. 373; The Jackson (D. C.) 58 Fed. 607; The Baltimore (D. C.) 56 Fed. 127. But the presence of the Woodruff and her tow totally changed the situation. The latter were then nearly abeam of the Clinton and near, which made it impossible for the Clinton to stop at once, without certain collision with the Woodruff's tow. She was bound, therefore, to do the best she could under such circumstances in the endeavor to clear the Woodruff's tow by keeping on in accordance with her previous signals, and by checking her speed and backing so as not to go too far beyond the Woodruff's tow when cleared, and to give the Booth all the chance that she could in the dangerous situation which the Booth had brought about by her own previous fault and neglect. I am satisfied that the Clinton did all that could be reasonably accomplished in this regard. Nor can I hold the Clinton in fault for giving her first signal of one whistle and shaping her course to go ahead of both tows, for the reason that that was within her right, and was her proper course; and because both the tows had sufficient time and space to keep out of the way, as was their duty to do, and which the Clinton had a right to expect that both alike would do. The John King, 1 C. C. A. 319, 49 Fed. 469.

Decree in favor of the libelant against the Booth with costs, and dismissing the libel as against the Clinton with costs.