## Case No. 10,541.

### The ONTARIO.

[8 Ben. 500.] [1]

District Court, E. D. New York.　July, 1876.

SALVAGE—DERELICT—DISTRIBUTION.

1. Where a canal-boat in heavy weather broke loose from a tow, in going across the upper bay of New York. and was picked up by a tug and taken to Staten Island. the towing boat being present but not interfering with the labor of the tug; *Held*. that, while the canal-boat was not a derelict, as her towing boat was in sight and watching her. nevertheless the service rendered by the tug was a proper salvage service. and the court would award as a proper compensation $400 and costs. the value of the canal-boat and cargo being $1600.

2. A fireman, who at some risk. jumped on board the canal-boat to make a line fast. should receive a share equal to that of the master of the tug.

In admiralty.

Beebe. Wilcox & Hobbs, for libellants.

G. P. Hawes, for claimant.

---

## Case No. 10,542.

### The ONTARIO.

[The case reported under above title in Brown, Adm. 480, is the same as Case No. 8,283.]

---

## Case No. 10,543.

### The ONTARIO.

### The HELEN MAR.

[2 Lowell, 40; 7 Am. Law Rev. 754.] [1]

District Court. D. Massachusetts.　Aug., 1871. [2]

COLLISION — LIGHTS — IGNORANCE OF STATUTE — PRESUMPTION AS TO FAULT — ABANDONMENT — TOTAL LOSS—WHALING VOYAGE—FREIGHT.

1. A whale-ship in the Arctic ocean. which had been twice refitted at San Francisco, after the statute of 29th April. 1864 [13 Stat. 58], concerning collisions. was passed. and which could have procured the colored lights at that port, *held* in fault for not having such lights,

---

[1] [Reported by Robert D. Benedict. Esq.. and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Hon. John Lowell, LL.D., District Judge. and here reprinted by permission. 7 Am. Law Rev. 754. contains only a partial report.]

[2] [Affirmed in part and reversed in part, in Case No. 13,695.]

though her master had never heard of the statute.

2. A vessel having the right of way in the night-time, and not having the statute lights, is presumed to be in fault in respect to a collision with a vessel that should have seen her and given way.

[Cited in The City of Savannah, 41 Fed. 893.]

3. The vessel bound to give way is likewise in fault, if by diligence and attention her lookout might have discovered the vessel that had not proper lights.

[Cited in The City of Savannah, 41 Fed. 893.]

4. Where one of the ships damaged by a collision was abandoned in the Arctic ocean, under a reasonable apprehension that the lives of the crew would be endangered by trying to save her, *held*, her loss should be assessed as a total one, though the other ship similarly damaged was saved.

[Cited in The C. H. Foster, 1 Fed. 734.]

5. Under the statute limiting the liability of ship-owners, the outfits of a whaleman are part of the appurtenances of the ship in estimating value.

6. Under the same statute, there is no freight pending in a voyage for catching whales.

[7. Cited in The Abby Ingalls, 12 Fed. 218, to the point that where two vessels are meeting, end on or nearly end on, the one close-hauled on the starboard tack and the other having the wind on her port side, the vessel close-hauled has the right of way.]

[8. Cited in The Ada A. Kennedy, 33 Fed. 624, to the point that a vessel hove to and making both headway and leeway is a vessel close-hauled within the meaning of the rules of navigation.]

Cross-libels for damage by collision between the whale-ships Ontario and Helen Mar, in the Arctic ocean, Sept. 26, 1866, at ten o'clock at night. A gale was blowing from the north-west, and both vessels were lying-to under storm-sails. They were bark-rigged vessels; and, according to their several pleadings, the Ontario was close-hauled on the starboard tack under close-reefed main topsail and foretop-mast staysail, and the Helen Mar was close-hauled on the port tack, having set her lower main-topsail, fore-staysail, and foretop-mast staysail. Each vessel was making from one and a half to two and a half knots, a considerable part of which was to leeward. The libel on behalf of the Ontario alleged that the night was bright moonlight, with occasional snow-squalls, and that the men of the Ontario saw the Helen Mar about half a mile off, and expected her to give way. The owners of the Helen Mar pleaded that there were thick snow-squalls, with intervals of clear weather; that there was a good lookout, but it was impossible to see the Ontario in time to avoid her, she having no sufficient lights.

The starboard sides of the vessels came together, and each lost the foremast and main and mizzen topmast and head-gear, besides the anchors, and all boats but one. The Ontario was abandoned, and the loss to her owners was alleged to be $150,000. The Helen Mar was brought out of the Arctic ocean, and reached San Francisco in safety, with a damage pleaded at $20,000. She made

several more cruises, and reached New Bedford in 1870. Witnesses were examined from time to time, as they arrived in this part of the country, and a few were produced in court; others could not be found. It was admitted that the Ontario had not the red and green lights required by law, Captain Barnes being ignorant of the statute. On her part it was contended that she carried a bright light in the lee mizzen rigging, and ought to have been discovered sooner, and, having the right of way, should have been avoided by the Helen Mar.

Two men were stationed amidships on the Helen Mar as lookout men,—one on the main hatch, and one on the vice-bench, just forward of that hatch, and raised several feet above it. This man was not examined; and it was proved that efforts had been made to find him, without success. The other man testified in court that he saw a light on the lee bow, and reported it to the second mate. The second mate, Mr. Shiverick, swore that immediately on the light being reported he went to the waist, but could see nothing; that he then ordered the wheel hard up and the main yard to be squared, and then went immediately to the bow and saw the light of a vessel not more than a ship's length off, and heard a voice on board of her say, "Hard up that helm," which he supposed to be addressed to the men of the Ontario. He thereupon ordered his own wheel to be put down again, and very soon afterwards the vessels came together. He said that the effect of his last order would be to ease the blow if the Ontario was falling off, as she had every appearance of doing; thinks they would have come together head and head if he had not given this order. This witness said, that during the snow-squalls it was dark, and between the squalls it was light, so that you could see a vessel for about half a mile. He afterwards said there was a kind of blur on the water, from the blowing of the water, and that he thought a vessel without lights could be seen about a quarter of a mile off at the time of the collision. He also said, that when he went to the bow he saw the Ontario, though by this he may have intended to refer to her light. The lookout confirmed substantially the evidence of Mr. Shiverick, excepting that he heard nothing from the other vessel, and he thought the light was about four points off the lee bow. The people of the Ontario denied that any change of her course was made at any time. They represented the weather as bright and clear for some time before the collision. Some of them swore that the moon was shining.

T. M. Stetson and O. Prescott, for the Ontario.

We admit that we had not the lights, but we had one nearly or quite as good, which ought to have been seen. The obligation to keep a good lookout was as strongly resting on the

Helen Mar, as that of showing a light rested on us. We could do nothing more than we did; and, the weather being such as it was, the fault lies with the other vessel, for the night was bright in the intervals of the slight snow-squalls.

Upon the evidence it was prudent and proper to abandon our vessel. There was great danger of losing both ship and crew at that season of the year in the Arctic ocean.

To the point that the want of regulation lights must have been the operative cause of the collision in order to affect the decision, see The Gray Eagle, 9 Wall. [76 U. S.] 505; The Eclipse, Lush. 422; The Flavio Gioja, 3 Mitch. Mar. Reg. 757; Morrison v. General Steam Nav. Co., 20 Eng. Law & Eq. 455.

If the night was clear, the Helen Mar should have seen us. The Niagara, 21 How. [62 U. S.] 7; Whittredge v. Dill, 23 How. [64 U. S.] 451; Union St. Co. v. New York, etc., Co., 24 How. [65 U. S.] 314. A case almost exactly like this is The Cynosure [Case No. 3,528]. We could have justified a departure from the duty of keeping our course by any inference that the Ontario would not do her duty, but were bound to keep on, as we did. Bentley v. Coyne, 4 Wall. [71 U. S.] 509; The Fairbanks, 9 Wall. [76 U. S.] 425; The Dumfries, Swab. 126.

G. Marston and W. W. Crapo (C. W. Clifford with them), for the Helen Mar, cited The Osprey [Case No. 10,606]; Clapp v. Young [Id. 2,786]; The Rob Roy, 3 W. Rob. Adm. 190; The City of London, Swab. 245; The Calla, Id. 465; The Livingstone, Id. 519; The City of Paris, Holt, Rule of Road, 15, 22; The Gustav, Id. 28, 34; The Lady of the Lake, Id. 37, 38; The Smales, Id. 40; The Eclipse, Lush. 422.

LOWELL, District Judge. The delay in this case seems to have been unavoidable by the parties, owing to the very great distance of the place of disaster from the home port of the vessels, and the dispersion of one of the crews; but it is much to be regretted. The contradictions of evidence for which this class of cases is noted have always seemed to me to be comparatively harmless, when the witnesses can be brought forward immediately after the event, so that their accuracy can be tested by those minute circumstances which escape with the lapse of time. Most of the leading facts of this collision are plain; but two or three matters of very great importance are disputed, and are not easily determined at this time.

I cannot doubt that the Ontario must bear at least one-half of the loss, because she had not the red and green lights. She had been refitted twice at San Francisco since the statute was passed, and it is not alleged that she could not have procured lanterns at that port, as the Helen Mar, in fact, did procure hers. No equivalent can be admitted for these signals, and, even if that were possible, the evidence does not show that the light used by this vessel was as powerful, or likely to be as useful, in giving precise information as the red and green lights would have been. Of the many cases arising under this and similar statutes there are very few in which the vessel having the duty to keep her course, and, therefore, to make known her presence, has been wholly excused when her lights were wanting, or were not of the required kind. If the night was so very bright that the lights would be of little or no practical use, or if the negligent vessel was, in fact, seen long before the collision, the fault might be held to be immaterial. The case of The Palestine, Holt, Rule of Road, 52, seems to come under the former alternative. But such cases are rare; the presumption must always be that the statute lights are the best signals, and that the absence of them on the vessel whose particular province it is to give notice of her position must have contributed to the disaster.

The fault alleged against the Helen Mar is, that she did not see the Ontario, and avoid her, notwithstanding the want of the signal lights. The decision of this question depends on doubtful and contradictory evidence concerning the weather and the distance at which a vessel could be seen. The law requires great vigilance of the vessel that should give way, and the want of lights on the other vessel does not at all relieve this obligation. Article 20 of the statute (13 Stat. 61); Chamberlain v. Ward, 21 How. [62 U. S.] 548; Nelson v. Leland, 22 How. [63 U. S.] 48; Rogers v. The St. Charles, 19 How. [60 U. S.] 108; The Gray Eagle, 9 Wall. [76 U. S.] 510. However gross and palpable, therefore, may be the fault on one side, we are bound to examine into those alleged against the other. The question is very nearly this: Suppose the statute had not required these lights, were the night and the gale such as to excuse the Helen Mar for not seeing or for not avoiding the Ontario? I say the question is nearly the same, because I am not sure that something may not properly be conceded to the surprise of seeing a white light when you had a right to expect a colored one. I take for granted, as did both the counsel, that the Ontario had the right of way, because, although by the rule both were bound to port helms, yet the vessel that is absolutely close-hauled on the starboard tack can port no more without going in stays, which, it has been often decided, the statute does not require unless, indeed, in very extreme cases. The Helen Mar, then, was bound to port her wheel and go to the right; this she did, but when the vessels were so near together that their meeting was not prevented. I do not lay much stress upon the fact that the wheel was put to starboard after it had been put to port; because it seems to

be true, as alleged in the answer, that it was then too late to avoid the collision. And for the same reason I do not find the squaring of the Ontario's yard was of any importance. Her helm was not changed. The inquiry, therefore, is, whether there was any negligence in the lookout of the Helen Mar. The actual state of the weather, if we could ascertain it, would settle this point; but, in the contradictory state of the direct evidence, we are obliged to examine all the facts and circumstances which can give us any assistance. The Helen Mar had her wheel lashed, had but half her watch on deck, and her two lookout men were stationed nearly amidships. The testimony shows that these variations from ordinary rules are not unusual when a whaleship is lying-to in that ocean in a gale of wind. The cold of even the month of September in that region is such as to require every care to be taken of the men; and they are often permitted, when there is not much work to do on board, to keep what are called quarter watches, by which each watch is divided, and every man is on deck only half the usual time. The great number of hands which whale-ships carry makes this possible, without imprudence. There were four men on deck besides the officer, two of whom were on the lookout, and two were near the wheel, which could be freed in an instant. The position of the lookout is said to have been chosen amidships, because water came over the bows and froze, so that men ought not to be exposed there, the ship having no top-gallant forecastle. There was evidence that the position was a good one for seeing a vessel to leeward, if the sail was such as is sworn to on the stand by the officer of the deck and the lookout, namely, a foretop-mast staysail only on the foremast; but if there was a fore-staysail, as that would come below the rail, it would be likely to interfere with the view. Now it is a circumstance of some importance that the answer sworn to in May, 1868, and the deposition of the mate taken in September, 1867, and the deposition of the master, all say that there was a fore-staysail. Four of the witnesses from the Ontario, two of whom were examined early in the case, say they saw the sails of the Helen Mar, and three of them remember only a lower main top sail and a foretop-mast staysail, the fourth adds a fore-staysail. There was no close examination on this point, the importance of which was not then developed. The number of witnesses preponderates in favor of the present contention of the respondents; and yet very great weight must be given to the answer, which is supposed to be made with care, and to be the statement on which the other party has a right to rely.

I must hold it to be a doubtful question of fact, whether the vessel had not a fore-staysail. Then the witnesses all agree that there had not been a snow-squall for some time, several of them on both sides say for fifteen or twenty minutes before the collision; and the decided preponderance of the evidence is, that between the squalls the night was so bright that a vessel without a light could be seen at least a quarter of a mile off. It appears that the lookout of the Ontario was in the bow, and that the hull of the Helen Mar was seen a considerable time before the collision; and there are several little circumstances which tend to show that the night was not very dark. When the Helen Mar was next refitted, a staging was put in her bow, to accommodate the lookout. Taking all these circumstances together, I am constrained to say that I think the Ontario or her light, or both, ought to have been seen sooner. I reach this conclusion with some reluctance, because the fault on the part of the Ontario was in the very appointments of the vessel, for which the owners and master are personally accountable; while the fault on the other part may have been the momentary carelessness of a sailor, after the responsible agents of the ship had done their duty in all respects. If, therefore, I could persuade myself that the night was thick, or even very dark, I should attribute the whole loss to the first fault, as was done in several of the cases cited by the respondents; but the pleadings themselves, and the decided preponderance of testimony, convince me that at the time of the collision, and for at least fifteen minutes before, there was an interval of clear weather, in which the vessel or her light might have been seen; and that there was a light in her mizzen rigging, though there is certainly a singular confusion in the testimony as to whether it was in the starboard or port rigging. I must order the damages on both sides to be added together, and each party to bear one-half of this aggregate loss.

The details of damage will be settled by an assessor; but one point not less important than that just considered was argued at the hearing, upon evidence of the opinions of many most accomplished experts, as applied to the other facts in the case. In actions of tort "the direct and immediate consequences of the injurious act are to be regarded, and not remote, speculative, and contingent consequences, which the party injured might easily have avoided by his own act." Loker v. Damon, 17 Pick. 288. If, therefore, by reasonable prudence, firmness, and skill the Ontario might have been saved, her owners cannot recover for a total loss. The Linda, Swab. 306; The Pensher, Id. 211. But in a case of doubt and difficulty, if the master acts in good faith, his decision is of itself evidence of the necessity of the abandonment, and ought not to be lightly overruled. The Flying Fish, 2 Pritch. Adm. Dig. 705, tit. "Registrar and Merchants," No. 171. And the master is not to be expected to risk the

lives of his crew, or to possess a higher degree of skill and judgment than are usually found in men in that position. The Blenheim, 1 Spinks, 289; Sherman v. Fream, 30 Barb. 478.

In this case, the hull of the bark was not injured, and in the open ocean there would have been, I suppose, little danger to the crew, while her provisions held out. But she could not work to windward, and was in a sea which would be closed by ice before long, and the passage from which was somewhat to windward, and was considered dangerous and difficult. The master consulted with two other captains, one of whom was in the employ of the same owners, and made up his mind that the only prudent course was to abandon his ship. The result attending the Helen Mar's attempt seems to show that this decision was unfortunate. Still I am not prepared to say that there was such a want of ordinary firmness and judgment that the loss should be thought to be too remote a consequence of the collision. The result of the very full evidence upon this head seems to be that expressed by one of the experts,— that many whaling masters would have made the effort. But, on the other hand, I think it is shown that it could hardly be less than a somewhat desperate effort, and one that many excellent captains would not be willing to make. Upon the whole, therefore, I am of opinion that the total damage actually sustained by the owners of the Ontario must be brought into the account.

Interlocutory decree that both vessels were in fault.

LOWELL, District Judge. In assessing the damage suffered by the owners of the Ontario, the oil and bone which were lost in the Arctic ocean have been estimated according to the rule laid down in Bourne v. Ashley [Case No. 1,699]. Exception is taken to this mode; and as it differs from that adopted in Taber v. Jenny [Id. 13,720], it cannot be considered as definitively established, until it shall have passed under review in the circuit court. In this case, the very large interests involved make it not improbable that the supreme court may eventually be called on to settle the important questions which are raised. All damages are more or less conjectual, unless when the subject is some article which has a value that is fixed, day by day, in the dealings of merchants or bankers, and the most reasonable and expedient rule must be imperfect. Upon a reconsideration of the case above cited, with the aid of the argument against it, I am unable to find any better rule, or one more likely to do justice in the general run of cases. It was argued that the price of oil and bone was exceptionally high at New Bedford at the time of the loss of the Ontario, and that, by making the assessment at that price, I should give the libellants what they never could have obtained in any possible combination of circumstances. There might be, and I think would be, a propriety in taking the average price for a few days or weeks, rather than that of any one day, as fixing the supposed value of a cargo, in order to avoid any mere accident of the market. I do not understand that this would relieve the difficulty, nor that it has not in fact been done by the assessor. The argument goes further, and insists that if we take New Bedford prices, they should be such as the owners might by possibility have realized. It does not seem to me that any such modification of the rule can be adopted. The libellants had a thing in the Arctic sea which would not have come home at that time, and perhaps never, and of which we must find the value then and there, as well as we may. Some of the evidence in Bourne v. Ashley [supra] tended to show that the oil and bone were worth in the Arctic ocean what they were in New Bedford, after deducting the expense of getting it home. Nothing in the assessor's report here contradicts it. I suppose that, for purposes of sale, insurance, or any other contract, the owners of the cargo really had a property there of the estimated value, and, if they had been able to know the quantity, could have realized that value. It was suggested that the market price in New Bedford of the article at the time and place it was in is the true rule. This would be so if there were any such market price; that is to say, if such sales were made often enough to establish a tariff of prices. But there is no evidence of any such thing. If sales to arrive were often made, there is no reason to suppose, and no evidence, that any very material allowance would be made in them for subsequent fluctuations of the market.

Two most interesting and difficult questions of law have been argued in reference to the limitation of liability of the owners of the Helen Mar. I may as well say at the outset that the ship appears to have been appraised at her value before the collision, which is opposed to the decision in Norwich Co. v. Wright, 13 Wall. [80 U. S.] 104. Counsel were familiar with that case, and I understood them to say it had been followed; but I do not so read the assessor's report.

The other questions are: whether the outfit of the vessel is to be included in the valuation; and whether any and what freight is to be reckoned on her oil and bone. The case of The Dundee, decided by Lord Stowell, and affirmed by the king's bench under the presidency of Lord Tenterden, established the interpretation of the English statute 53 Geo. III. c. 159, as including the fishing stores, as they are called in that case, of a whaler, among the appurtenances of the ship. The Dundee, 1 Hagg. Adm. 109; Gale v. Laurie, 5 Barn. & C. 156. In the trial at common law the jury found that by the usage of the trade such stores are not covered by a policy on a ship, her tackle, apparel, munitions, and furniture, and were not so covered at the date

of the act of parliament; and the defence relied much upon that usage as proved, and as shown by the report of the case of Huskins v. Pickersgill, 3 Doug. 222. In deciding the case in the admiralty the learned judge said:

"It may not be a simple matter to define what is and what is not an appurtenance of a ship. There are some things that are universally so, things which must be appurtenant to every ship, qua ship, be its occupation what it may. But, I think, it is rather gratuitously assumed that particular things may not become so from their immediate and indispensable connection with a ship, in the particular occupation to which she is destined, and in which she is engaged. * * * Whether a whaler is originally built with any peculiarity of construction for that service is more than I know; but this is clear, that unless she has various appurtenances not wanted in other ships, as well as a crew peculiarly trained, she had better stay at home than resort to the Arctic regions, where alone her function can be exercised. A ship of war, public or private, has a special character, and it is a necessary consequence that she shall have special appurtenances. A packet, and particularly a steam packet, has its specialties. A Greenland ship is not a merchant ship, carrying out a cargo to be exchanged; she has character superadded by her special occupation, and must have the machinery adapted to the catching of whales, and to the dressing them, in part, on board the vessel." 1 Hagg. Adm. 126.

The court of king's bench followed the same general course of reasoning, and in respect to the argument from the usage in policies said:

"It is true that, in case of insurance, these stores are not considered as covered by an ordinary policy on the ship. But insurance is a matter of contract, and the construction of the contract depends in many cases upon usage. The construction of a policy can furnish no rule for the construction of this act of parliament which was passed for purposes of a different nature." 5 Barn. & C. 164.

It cannot be denied that a great part of the discussion in both courts in the case of The Dundee turned upon the meaning of the word "appurtenances," which is used in the English statute, but is not found in our act of 1851. We hold the owner to respond only for the value of his ship and the freight then pending. The only question for me is whether this whaling outfit is part of the ship in the sense of the statute. In my opinion it is. I understand that a ship in that law includes her appurtenances. If not, I am at a loss to know where the line is to be drawn, and whether we are to appraise the sails, rigging, boats, furniture, and general fittings, or which of them. In the common speech of merchants the whole adventure of a vessel, in full employment, consists of ship, freight, and cargo. The whaling equipment has been decided not to be cargo, Hill v. Patten, 8 East, 373, and it certainly is not freight. The argument for the owners of the Dundee was, that "appurtenances" means no more than tackle, apparel, and furniture, and was used to save the repetition of those words; and as those words did not, in insurance law, include the equipment, the word "appurtenances" should be restricted in like manner. The courts, though dwelling, as was fit, upon the precise words of the statute, yet did not reject the premises of the defendants, but only their conclusion. They did not deny the pertinency of the citation, as giving a construction to appurtenances, if the question had been one of insurance, but only its effect in construing that word in a statute. In fact, there are two rules in the law of insurance: One, that in a policy on a merchant ship the outfit is included. The other, that in a policy on a fishing vessel it is excluded. The former rule was established by the courts; the latter, which may well enough be called an exception, is founded in usage. Phil. Ins. §§ 463, 496, 497, and cases.

Mr. Phillips (section 463) says that the usual form of policy in this country is simply on the ship, and that it is well settled that on a policy for a commercial voyage this includes sails, rigging, boats, armaments, provisions, and all the appurtenances suitable or usual on such a voyage as is described; but that the rule is different in fishing voyages. This difference, as we have seen, had its origin in usage. No doubt, it is a reasonable usage, arising out of the great value of the outfit in many of these voyages; but in construing a statute of general application, we ought not to assume a different doctrine for different kinds of vessels, varying with the accidental variations of value in the outfits, and especially in a statute restricting remedies. This will hardly be maintained; and if not, then it only remains to ascertain whether appurtenances should be included or excluded in all cases. As I said before, it is the better opinion that the statute, in using the word "ship," intended to include her appurtenances.

It is much more doubtful whether it can be held that there was any freight pending on the voyage of the Helen Mar. Had it been a freighting voyage, the English statute in terms, and ours by construction, would have authorized the assessment to the owners of the value of the freight to them for the carriage of their own goods. St. 53 Geo. III. c. 159, § 2; Allen v. Mackay [Case No. 228]. In a whaling voyage the share of the catch which is retained by the owners has many analogies to freight, because it represents the earnings of the ship. The Antelope [Id. 484]. Still it has been decided not to be so far analogous to accruing freight as to pass by a sale of the

ship. Langton v. Horton, 5 Beav. 9; and I do not doubt the soundness of that ruling. It is not commonly called freight, and it would be an unwarrantable stretch of construction to bring it within that word in the act. In The Dundee it was taken for granted in both courts by the learned and eminent judges who delivered the judgments, that there would be no freight in that case, even under the second section of the statute, which puts owners who carry their own goods upon an exact equality with those who earn freight from carrying the goods of others. They thought the point a clear one, and used it as an argument for including the outfit, that there was no freight in such a voyage. So far as the proportion of the oil and bone which is the share of the officers and crew is concerned, the owners are not benefited by its being carried to a port of delivery; and, on the whole, I think that there is no freight pending in a whaling or fishing voyage in the sense of the statute. If there should be held to be a constructive freight, it would be almost impossible to assess it, because in many of these voyages there is no place from which it can be reckoned. The whales are caught at various parts of the ocean, hundreds or thousands of miles apart, at various times during a period of from one to five• years, and there would be in most cases no means of arriving at any thing like a fair estimate of a freight which never in fact exists.

I affirm the assessor's report as to all matters of fact found by him, and decide: (1) The Helen Mar is to be valued immediately after the collision, instead of before it, (2) with her equipment, (3) with no allowance for freight.

[On appeal to the circuit court, this decree was affirmed so far as it held both vessels in fault, and the aggregate damages to be divided, and reversed so far as it included in the valuation of the Helen Mar her whaling outfits, as a basis for determining the extent of the liability of her owners. Case No. 13,695.]