THE PACIFIC NAVIGATION COMPANY *vs.* S. C. ALLEN.

S. C. ALLEN *vs.* THE PACIFIC NAVIGATION COMPANY.

The "Moiwahine." The "James I. Dowsett."

Appeal from the Decision of the Chief Justice sitting in Admiralty.

February 25, 26 and 28, as of January Term, 1887.

Judd, C.J., McCully, Preston and Fornander, JJ.  Bickerton, J., having been of Counsel in the case, did not sit.

On the night of the 29th June, 1886, the steamer J. I. Dowsett had left Kuau, a port near Kahului, on the Island of Maui, and was proceeding under sail and steam down the Molokai Channel for Hono-

lulu. The wind was the usual trade-wind, blowing at the rate of about thirty miles an hour in the direction of E.N.E. The J. I. Dowsett had all sail set and her course was W.S.W. The breeze being a fair wind to her, her sails were "wing-a-wing," her foresail being over on her starboard side and her mainsail on the port side. She was going at the rate of from nine to ten knots per hour. The Moiwahine, a schooner, was running close to the wind on the port tack, with all her sails set, and going from seven to eight knots per hour, steering S.E. by E. The night was moonless, but the sky was clear and the stars were shining. Shortly before eleven o'clock the bright mast-head light of the J. I. Dowsett was seen to windward by the lookouts of the Moiwahine, reported to the mate whose watch it was, and to the captain, who, hearing his men talking about a light, came on deck. The vessels were about midway in the channel between Molokai, Lanai and Maui, at a point estimated to be somewhat eastward of the port of Kaunakakai on Molokai. There was plenty of sea room for both vessels, and there are no reefs or obstructions to navigation near the place of collision. The Captain of the Moiwahine saw first the mast-head light of the J. I. Dowsett, then her red light on the Moiwahine's port bow, and judged her to be three-quarters to one mile off; about a minute after he saw her green light and after that her red and green lights. The captain could not tell within two or three points the course the J. I. Dowsett was coming down on; but she appeared to yaw from side to side. When about one hundred or one hundred and fifty feet off, the captain called out to the steamer to "port your helm," and when about seventy-five or one hundred feet off, the helmsman on the J. I. Dowsett gave his wheel a turn to port, and the collision being imminent, the Captain of the Moiwahine ordered his own wheel to port, and his main sheet slacked off, which put the Moiwahine's head off and increased her speed, and brought her stem slightly towards the J. I. Dowsett. The J. I. Dowsett's stem struck the Moiwahine about six feet from the taffrail on the port quarter a violent blow, but did not fasten.

Held, affirming the decree of the Chief Justice, that the navigation of the Moiwahine was proper under the circumstances, and did not contribute to the collision, which had become inevitable, and that by the J. I. Dowsett neglecting to keep a proper lookout, she was solely to blame.

OPINION OF THE COURT, BY PRESTON, J.

THIS is an appeal by the Pacific Navigation Company from

a decision of the Chief Justice whereby he held the steamer J. I. Dowsett solely to blame for a collision which happened between that vessel and the schooner Moiwahine, on the night of the 29th of June, 1886, and awarded the sum of $676.30 to the owners of the schooner for damages sustained by reason of such collision.

The facts of the case appear fully in the decision of the Chief Justice and need not be repeated here, except so far as may be necessary to properly understand the claim made on behalf of the James I. Dowsett.

The appellant claims that the decision of the Chief Justice is wrong in holding the Dowsett solely to blame, and contends:

1. That the weight of evidence shows the Moiwahine to be in fault in not exhibiting any lights.

2. That therefore the Moiwahine could not recover any damages against the Dowsett, but should be held liable because the neglect to carry lights was a culpable omission and a violation of statute law.

In support of this contention counsel cited (inter alia) The Olivia, 1 Lush., 497. Larco vs. The Martha & Elizabeth, 1 Sawyer, 129. The Carroll, 8 Wallace, 302. The D. P., 1 Lowell, 124. Taylor vs. Harwood, Taney's Decisions, 437. The Helen Mar, 2 Lowell, 40.

3. That the neglect to exhibit lights contributed to the collision, and therefore the damage should be divided.

4. That the collision was caused by the improper navigation of the Moiwahine, immediately preceding the collision, through her captain ordering her helm to be put up and to slack off the sheet, instead of ordering the helm to be put down, or keeping her course.

The Scotia, 14 Wall., 170: St. John vs. Paine, 10 How., 557: The Genesee Chief, 12 How., 443, and other authorities, were cited in support of this argument.

On behalf of the respondents it was contended the evidence showed that the Moiwahine carried proper lights, that the maneuvre ordered by the captain was proper under the circumstances in which his vessel was placed, and even supposing the

Moiwahine did not show any lights, yet if the Dowsett could have avoided the collision, she would be responsible, and that it would have been avoided had the Dowsett kept a proper lookout.

The *Ariadne,* 13 Wallace, 475.

Counsel for the respondent also cited: 1 Parsons on Maritime Law, pp. 190, 192, 198, 395, 396. *Chamberlain et al. vs. Ward,* 21 Howard, 570, 571. *St. John vs. Paine et al.,* 10 How., 557. *Genesee Chief vs. Fitshugh,* 12 How., 443. *Ward et al vs. The Ogdensburg,* 5 McLean, 634. *Larco vs. Schooner Martha and Elizabeth,* 1 Saw., 134. *Baker vs. City of New York,* 1 Clifford, 83. *Steamboat Neptune,* Olcott, 495. *Empire State,* 1 Benedict's Adm., 57.

### By the Court:

In respect to the point, that the Moiwahine did not show any lights, the evidence is certainly very conflicting, as is usual in cases of this nature. The Court below found that the Moiwahine did carry the proper lights, and in this respect gave more credit to the witnesses on behalf of that vessel than to those on board the Dowsett, and we see no reason, on a careful consideration of the whole of the testimony and of the arguments of counsel, to differ from the conclusions arrived at by the Chief Justice on this point; on the contrary we think and feel no doubt that the Moiwahine did carry the lights required by law, and in their proper positions.

As to the second point, that the alleged neglect of the Moiwahine to exhibit any lights disentitles her to recover any damages, it is hardly necessary, from the views we have taken of the evidence, to consider it, except for the purpose of passing upon the authorities cited by counsel for the appellants.

The principal case relied upon is *The Olivia,* in which Dr. Lushington says: (1 Lushington, 502), "The question now to be determined is, whether this culpable omission of the Safe Return to show a light is to be considered as a blameable disregard of ordinary nautical precaution, or a violation of statute law. If the former only, then the plaintiffs will be entitled to recover half their damages; but if the latter, a question may

arise, whether the plaintiffs are not altogether barred of recovery."

The statute here referred to is the "English Mercantile Shipping Act, 1854," Section 298 of which provides that if a collision is occasioned by the non-observance of any rule for the exhibition of lights, etc., the owner of the ship by which such rule has been infringed shall not be entitled to recover any recompense whatever for any damage sustained by such ship in such collision, unless it is shown to the satisfaction of the Court that the circumstances of the case made a departure from the rule necessary. (See the Section in *The Milan*, 1 Lush., 389).

No such provision is contained in our statutes, and it is contrary to the course of decisions since the issuance of the "Regulations for preventing Collisions at Sea," of 1863, which were adopted in this Kingdom and afterwards modified in accordance with the amended Regulations.

The case of *The Martha & Elizabeth* was decided in the U. S. District Court, District of California, and although the head note in the report, (1 Sawyer, 129), tends to show that the decision was solely on the ground that "*Lights required by law must be displayed*," yet the learned Judge Hoffman, who heard the case, admitted testimony to show that the collision was caused by the gross fault and mismanagement of the colliding vessel, and held that the evidence negatived such allegation.

There can be no doubt as to the rule observed in the whole course of the decisions of Courts of Admiralty, that where the neglect of the vessel to obey the statutory rules as to carrying lights, or of navigation, has contributed to a collision, the vessel in default is held responsible to the extent of one-half or the whole of the damages, as the case may be, and the authorities cited on behalf of the appellant maintain this view.

As to the contention on behalf of the appellant that the Moiwahine executed a wrong maneuver immediately before the collision, we agree with the opinion of the Court below, that such maneuver was justifiable under the circumstances, and indeed prevented greater damage than would have been sustained had she continued on her course. It was made when the collision was inevitable through the default of the steamer.

Although there is authority to support the contention of the respondents, that even supposing the Moiwahine did not exhibit any lights, yet if the Dowsett could have avoided the collision she would be responsible, (see in addition to the authorities quoted by respondents: *The Englishman*, L. R. 3, P. D. 18: *The Chusan*, 53 L. T. R. N. S., 60), and such is the view taken by Mr. Justice Fornander: we do not decide this case on that ground. We adopt the reasoning of the Court below, and find

1. That the Moiwahine exhibited the proper lights.

2. That the navigation of the Moiwahine was proper under the circumstances, and did not contribute to the collision, which had become inevitable.

3. That the collision was caused by the Dowsett neglecting to keep a proper lookout, and therefore she was solely to blame.

The decree of the Chief Justice is therefore affirmed with costs.

---

OPINION OF MR. JUSTICE FORNANDER.

Having heard the evidence and the arguments of counsel, I am painfully affected by the positive and diametrically opposed character of the evidence of the two ships' crews, that of the J. I. Dowsett and that of the Moiwahine, as to the fact whether the Moiwahine carried proper and legal lights previous to the collision.

That seven or eight men, from the master down, on one side or the other, should have willfully and maliciously perjured themselves, is hard to believe, and though the evidence furnishes no clue to the discrepancy, I am willing to believe that each side honestly thinks itself right.

Such being the case, the two sets of evidence, as to whether the Moiwahine was properly lighted or not, neutralize each other; and, were it the only fact bearing upon the collision and its cause, judgment would have to go against the Dowsett as not being sufficiently proven.

2

But, fortunately, there is one material fact to which the crews of both vessels agree without variation. It is this: They say that "though the night was dark, yet it was a starry night;" it might have been hazy under the land, but in mid channel, where they were, it was not hazy. That fact and its consequences does not seem to me to have been sufficiently elucidated on the trial; but what that fact implies I will now endeavor to state. A dark but starry night implies the ability of seeing a very considerable distance ahead of the vessel on which you are. I have followed the sea professionally, in my younger days, (for sixteen years), from foremast hand to master mariner, and I think I am greatly within the mark when I say that on a dark (moonless) but starry night, a vessel of the size of the Moiwahine under all sail, mainsail, foresail and jib, standing across the course of another vessel, ought to have been distinctly visible at least half a mile off.

That the Moiwahine was not seen at that distance from the deck of the Dowsett, in fact was not seen at all until the time of the collision, is to me abundant evidence that the watch or lookout of the Dowsett was either asleep, absent, or culpably lax in their duty.

Had they seen the Moiwahine, as they ought to have done on "a dark but starry night," there would have been ample time to inform the officer of the deck, or the captain, and to adopt such maneuvers as would have avoided collision.

Our statutes are positive that steamers must give way to sailing vessels, and they have no proviso that if such sailing vessels do not carry proper lights, that fact makes the steamer excusable in case of collision.

Light or no light, the Moiwahine, under all sails, on a dark but starry night, should have been seen by the Dowsett as an object to be avoided.

I therefore concur with the Chief Justice in dismissing the suit of the Dowsett and awarding the damages he does to the Moiwahine.

*Neumann, Whiting* and *Creighton*, for appellant.
*Dole* and *Kinney*, for respondents.

THE FOLLOWING IS THE DECISION OF JUDD, C.J., FROM WHICH
THE APPEAL WAS TAKEN.

The Pacific Navigation Company, a domestic Corporation owning the steamer James I. Dowsett, libeled Samuel C. Allen *in personam*, as the owner of the schooner Moiwahine, claiming twenty-five thousand dollars damages for the total loss of its vessel, the steamer James I. Dowsett, alleging that the loss was occasioned by the fault of the Moiwahine for not having lights as required by law.

Mr. Allen filed an answer and a cross libel, claiming of the owners of the Dowsett one thousand dollars for damages to the Moiwahine, alleging that the collision was by the fault of the Dowsett.

I find the facts to be as follows:

On Tuesday night, about eleven o'clock of the 29th June, 1886, the schooner Moiwahine was proceeding on her way from Honolulu to Kohala, Hawaii. She was commanded by Captain M. Staples, a master mariner of experience, this being his second trip upon her. She was a new vessel, sound and seaworthy, well equipped in every respect, and had a crew of Hawaiians and a mate and cook, in all nine souls.

The Dowsett was a steamer but little over a year old, running between Honolulu and Kuau, a port near Kahului on Maui.

Captain Charles V. Dudoit was her master, a man of long experience in inter-island navigation. She had two mates, one engineer, one cook and steward, and a crew of ten men, in all seventeen.

On the night in question, the Dowsett had left Kuau at about 6.30 P.M., and was proceeding under sail and steam down the Molokai Channel for Honolulu. The wind was the usual trade wind, blowing at the rate of about thirty miles an hour in the direction of E.N.E.

The Dowsett had all sail set and her course was W.S.W. The breeze being a fair wind to her, her sails were "wing-a-wing," her foresail being over on her starboard side and her mainsail on the port side. She was going at the rate of from nine to ten knots per hour.

The Moiwahine was running close to the wind on the port tack with all her sails set, and going from seven to eight knots per hour, and was steering S.E. by E. The night was moonless but the sky was clear and the stars were shining; some say it was hazy towards the land. Shortly before eleven o'clock that night, the bright mast-head light of the Dowsett was seen to windward by the lookouts of the Moiwahine, reported to the mate whose watch it was, and to the captain, who, hearing his men talking about a light, had come on deck. The vessels were about midway in the channel, between Molokai, Lanai and Maui, at a point estimated to be somewhat eastward of the port of Kaunakakai on Molokai. There was plenty of sea room for both vessels, and there are no reefs or obstructions to navigation near the place of collision. The captain of the schooner testifies that he saw first the masthead light of the Dowsett, then her red light on the schooner's port bow, and judged her to be three-quarters to one mile off; about a minute after that he saw her green light, and after that her red and green lights.

He says he could not tell within two or three points the course the Dowsett was coming down on; that she appeared to yaw from side to side. When about one hundred or one hundred and fifty feet off, the captain called out to the steamer to "port your helm," and when nearer, say one hundred or seventy-five feet off, the man on the Dowsett gave his wheel one turn to port and, the collision being imminent, he ordered his own wheel to port and his main sheet slacked off, which put the schooner's head off and increased her speed, and brought her stem slightly towards the steamer. The steamer's stem (she had no bowsprit) struck the schooner about six feet from the taffrail on the port quarter a violent blow, but did not fasten.

She then forged ahead, passing the schooner's stern and finally stopped. She then started ahead and passed around on the starboard side of the schooner and hailed her, kept on and crossed her bows, came up on her port side and went off towards Molokai.

Captain Dudoit had lain down on a transom in the wheel-house, just behind the helmsman, a few minutes before eleven

o'clock and had dropped to sleep, having had but little rest the night previous, and none during the day.

A Japanese was at the wheel.

The second mate, Liloa, was on watch at the time. Two lookouts, Kaupalei and Kealoha, were forward of the foremast, at the bitts. The engineer, Boyd, was tending his engine, and the steward, Antonio Galaspo, was lying down in the cabin, but not asleep. All the rest of the ship's company were either in the house on deck or on the hurricane deck asleep. The steamer had left Honolulu the night before, and reached Kuau on Tuesday morning, discharged her cargo and had taken in 1300 bags of sugar, (1500 bags being a full load), the crew working all day. Captain Dudoit says he was awakened by a shout, and as he jumped up from the transom he felt the shock (of the collision). "The shout and the shock were almost together." "The man at the wheel was shifting his wheel to port." He immediately rang the bell to stop the engine, looked out of the wheel-house window and saw the schooner he had collided with.

The mate, Liloa, says he was squatting down on the port side of the wheel-house, lighting his pipe, when he heard Kealoha call out three times, "We are colliding (or running into) a schooner." He then started forward, but before he could get down on the deck, the steamer struck and he was thrown down. The lookout, Kaupalei, had about this time left his place forward, to ascertain what time it was from the clock in the engine room. When he got as far as the fore-hatch on his errand, he heard Kealoha call out, "We are running into a schooner," and the collision occurred immediately after. The other lookout was Kealoha, a lad of perhaps sixteen years, who had been to sea for only two months. He was asked, "What did you first see of the vessel," and answered ingenuously, "I saw nothing." "I saw her very close; I did not see her before." * * * "I called out to Liloa, we are colliding with a schooner, and we struck."

Thus only one man on the Dowsett saw the schooner at all

previous to the collision. The testimony of the Dowsett's people, above given, is not contradicted.

It is certain that the Moiwahine was not seen by the Dowsett in time for them to avert a collision. The conclusion I have come to is, that the turn to port given to the wheel by the Japanese helmsman was not made in obedience to any order of the Dowsett's officers, for they testify to giving none; and if it was in response to the order of Captain Staples, it was too late to be of any effect. It seems to me that it was only the ordinary moving of the wheel to keep her steady on her course, while steering the difficult trick of going dead before the wind.

But why was the schooner not seen?

The case for the Dowsett is that it was because the schooner had no lights. Kealoha, the lookout, says it was so dark he could not see her, but if she had had lights he could have seen her, and that she had no lights. Immediately after the collision, Captain Dudoit, Liloa (second mate), the steward, the engineer, the mate, Kanoa, and others of the crew, say they looked at her and saw no light. Some say they saw the binnacle light and the light of the cabin; and they agree in the rather remarkable statement that after the steamer had rounded the schooner they saw a green light on the port side, between the fore and main rigging. I will allude to this later on.

On the other hand, Captain Staples, his mate Kuanoni, the two lookouts, Ku and George Albert, Nehemia the helmsman, and the rest of the crew, all say most unhesitatingly that the side lights were lit shortly after sundown that night, inspected by the Captain, and then placed correctly in the fore rigging— the green on the starboard, and the red on the port side.

The lookouts say that after they saw the lights of the approaching steamer, they saw that their own lights were burning brightly. The Captain and mate say that they knew they were so, not only from the reports of the lookouts, but from seeing, while aft, light from the crevices in the lanterns and from the ventilating holes in their tops and bottoms. A personal inspection of these lights during the trial convinces me that this

is possible, and, moreover, that they satisfy the requirements of the law, as to position and screen-board, etc.

Contradictions in testimony from crews of opposing vessels are unfortunately so common in collision cases that Courts of Admiralty speak of them as the usual thing, and to be expected.

Which is more likely to be true in reference to the schooner's lights, the testimony of the Dowsett's people or of those on the Moiwahine ?

It is to the credit of the vigilance of the Moiwahine's watch on duty that they saw the Dowsett's lights when she was say a mile off, and were on the alert and at their stations when the collision occurred. This condition was more favorable to accurate observation than that of the Dowsett's watch.

The excitement attendant upon the sudden and unexpected collision, the attention they had to pay to their own vessel in lowering their sails, and in going around the schooner, were conditions unfavorable to accurate observation.

Certainly, the position of the schooner immediately after the collision, when the Dowsett's people would naturally look to see if she had lights, was such they could not see her lights if she had them, for the schooner had swung off before the wind, and her stern was pointing towards the Dowsett's bow.

Still they should have been seen by them when they rounded the schooner's bows.

I have come to the conclusion that, without imputing dishonesty and perjury to the Dowsett's people, they must have looked at the schooner only when she was in an unfavorable position for her lights to be seen, and that when her position was favorable, they must have been occupied with other matters, and did not make calm and accurate observations.

The readiness with which the steamer's crew would be likely to color the evidence that would tend to exculpate their own negligence must also be taken into consideration.

This is to my mind a more satisfactory solution than to impute, without foundation, willful perjury to the Captain, mate and watch of the schooner Moiwahine. Their testimony in this

respect is so positive and circumstantial, and so probable, that I am convinced of its truth.

It is not at all likely that Captain Staples, with a mariner's experience in waters where the law in regard to carrying lights is strictly observed, and where navigation is more difficult and dangerous, would so soon have fallen into the slack ways which it is said prevail in our inter-island waters.

It must not be forgotten that there was but one lookout in service on the Dowsett at and just before the collision—the boy Kealoha—and he says he had stood his watch as lookout from 8 to 12 on the previous night, and had worked all day discharging and loading cargo at Kuau. "Nautical lookouts must be properly stationed, and should be vigilant in the performance of their duty; and if they are incompetent or inattentive, and the collision occurs in consequence of their neglect, the vessel to which the lookout is attached must be held responsible for the injury resulting to the other vessel." Judge Clifford, in *The Sea Gull*, 23 Wallace, 174.

I cannot consider the lookout on the Dowsett as answering the requirements of competency and vigilance. He should have been the best and the freshest sailor in the ship, especially considering that the Dowsett was running at full speed down the channel on a night when it was known that several steamers were leaving Honolulu, and would be met. Ship-owners are responsible if they impose such continuous duty on their men as to make it physically impossible for them to keep awake cr be vigilant. The watch had evidently become wearisome to Kealoha and Kaupalei, for the latter had left his post about 11 o'clock to see if it was not midnight by the ship's clock, when his watch would cease.

The only solution, of the statement that the Dowsett's crew saw, after they had rounded the schooner, a green light displayed on her port side, between her fore and main rigging, which is at all satisfactory to me, is that the schooner went about and started for Honolulu as the Dowsett was leaving her for Molokai. Captain Staples says he did so when the Dowsett

was from 600 to 800 feet from the schooner. This would make the green light on the starboard side visible from the Dowsett; and if she did not wear around, but tacked, the light would appear to be about the mainmast, if the observers thought her bow was where her stern was, they not noticing that she had tacked ship.

The testimony of the steward of the Dowsett in regard to seeing a man put up the light and throw the match to windward as if he had just lit it, I regard as unworthy of belief, as well as the testimony of Palaile (Friday), of the Moiwahine, that the green light was used to examine the injuries on his vessel.

Having found that the schooner had her proper lights displayed during the night of the collision, the decision of this case becomes simple. Without doubt the lines of the courses which the respective vessels were pursuing would intersect if continued. The best proof of this is the fact that a collision did occur.

It is clear from the evidence that the schooner was not seen by the steamer until the collision was imminent, and I think inevitable. I have found that the schooner had proper lights. It follows, as a necessary conclusion, from these facts and the law, that the steamer was the cause of the disaster. Both vessels were Hawaiian, and the place of collision is one of our own channels.

In 1864 the Legislature passed an Act, in compliance with a request from Great Britain and France, entitled an "Act for preventing collisions at sea;" this was amended and re-enacted in 1886, and was in force at the time of the collision.

Article 17 reads: "If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve the risk of collision, the steamship shall keep out of the way of the sailing ship."

Article 18: "Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse if necessary."

Article 22 : " When, by the above rules, one of two ships is to keep out of the way, the other shall keep her course."

Article 23 : " In obeying and construing these rules, due regard shall be had to all dangers of navigation, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

By Article 17 it was the Dowsett's duty to keep out of the way.

" When a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precautions to avoid collision ; and if this be not done, *prima facie*, the steamer is chargeable with fault." *The Steamer Oregon vs. Rocca*, 18 Howard, 570.

But counsel for the Dowsett claim that it was the maneuver of the schooner in putting her helm up at the critical moment that caused the collision. An array of seafaring men gave testimony as nautical experts. Most of them agree in saying that in the position stated they would have put the schooner's helm down, which would throw her bow up into the wind towards the Dowsett, and her stern away from her ; and it is strongly urged upon me that the schooner should not have changed her course at all, and as she did, this occasioned the collision. Of such defenses the Supreme Court of the United States, in *Haney vs. Baltimore Steam Packet Co.*, 23 How., 291, use this language : " This is the stereotyped excuse usually resorted to for the purpose of justifying a careless collision. It is usually improbable and generally false."

It is due to some of the experts to say that they modified their testimony by stating that the bearing of the steamer coming down on to a schooner would make a difference, and would determine the propriety of the maneuver. If the steamer was heading towards the schooner's bow, and their distance apart was slight and their speed great, putting the schooner's head up into the wind might cause the impact of the vessels to be bows on, or bow and midships, when the damage would be greater, and perhaps sink both vessels. Captain Staples says his opinion was that if he had brought his bow up, the Dowsett would have struck his vessel about midships. As it was, he

escaped collision by about six feet.    All experts agree that the schooner's maneuver changed the position of her stern in respect to the Dowsett but slightly.

Such being the fact, I adopt the reasoning and conclusions of the Supreme Court of the United States in the following cases.

*N. Y. & Liverpool S. S. Co. vs. Rumball,* 21 Howard, 372.    In a collision between a sailing vessel and a steamer, which took place at sea, near the shore of Long Island, where the course of the sailing vessel was converging to the track of the steamer, the sailing vessel being then close hauled upon the wind, the evidence shows that the steamer was in fault.    The Court say : " Rules of navigation are obligatory upon vessels approaching each other, from the time the necessity for precaution begins, and continue to be applicable so long as the means and opportunity to avoid the danger remain.    They do not apply to a vessel required to keep her course, after the approach is so near that the collision is inevitable, and are equally inapplicable to vessels of every description, while they are yet so distant from each other that measures of precaution have not become necessary to avoid a collision.    Sailing vessels approaching a steamer are required to keep their course on account of the correlative duty, which is devolved upon the steamer, to keep out of the way, in order that the steamer may know the position of the object to be avoided, and may not be led into error in her endeavor to comply with the requirement.    Under the rule that the steamer must keep out of the way, she must of necessity determine for herself, and upon her own responsibility, independently of the sailing vessel, whether it is safer to go to the right or left, or to stop."

In *The Falcon,* 19 Wallace, 75 :    A steamer running at the rate of from eight to ten knots an hour, on a bright moonlight night, in an open bay with nothing to mislead her, condemned for the loss of a schooner, sailing with a six knot breeze, whose only fault was alleged to be a false maneuver in the moment of impending collision.    The answer of the steamer alleged that the collision was caused by the fault of the vessel in porting

her helm, and coming suddenly under the bow of the steamer when it was too late for the latter to avoid her. The Court say:

"The steamer was grossly in fault in approaching so near the schooner and at so high a rate of speed. This was the cause of the disaster that followed. The fault imputed to the schooner is that almost at the moment of collision, she ported her helm. * * * If the fact were as claimed it would not mitigate the fault of the steamer. The peril was immediately impending. The safety of the vessel and the lives of the crew were at stake. * * * If in an emergency so sudden and so alarming an order was given which should not have been given, or an act done which should not have been done, the law regards it as an error and not a fault, and holds the offending vessel to be the cause and liable as if it had not occurred."

It is rather remarkable that what the experts in the case before me say should have been done by the Moiwahine, that is, to put her bow up towards the on-coming steamer, is exactly what was pleaded in *The Falcon* to be the fault of the schooner.

*The Carroll*, 8 Wallace, 302. The schooner saw the steamer coming up the bay, about a quarter of a mile distant. The schooner was steering S. by E., her proper course, and the steamer's bearing from the schooner was about a point westward from the schooner's course. The schooner held her course until about the time of the collision, when, as it seemed inevitable, directions were given to starboard the helm in order to ease the blow; in consequence of which change the blow of the steamer was received forward of the fore rigging instead of the middle of the vessel, which would have been the case if the schooner had continued on her course.

The Court say: "The fact that the vessels did collide, explodes the theory that there was no risk of collision. * * * There is no evidence that the schooner changed her course until the peril was imminent, but the natural inquiry arises, which vessel was blameable for producing this peril? The schooner was not, because she was obliged to keep her course. She could not choose, because the law had chosen for her. It is otherwise

with the steamer. She could go to the right or left, and change as often as there was, in the apprehension of her officers, a necessity for change. The steamer is, therefore, to blame for suffering this peril to occur; for if it be conceded that the steamer was wrong in starboarding her helm, this cannot affect her right to recover, as she was in other respects without fault, because the steamer, having the right of way, put her in this predicament, and must answer for the consequences."

In the *Sea Gull*, 23 Wallace, 181, the Court say:

" These rules of navigation are of great importance, but they do not apply to the vessel required to keep her course, after the wrongful approach of the steamer is so near that the collision is inevitable, nor will an error committed by the sail vessel, under such circumstances of peril, if she is otherwise without fault, impair the right of the sail vessel to recover for the injuries sustained by the collision, for the plain reason that those who produced the peril and put the sail vessel in that situation are chargeable for the error and must answer for the consequences. Subject to that exception, the sail vessel must keep her course; but the case before the Court, if any change was made in the course of the schooner, falls within the exception."

Many more authorities might be quoted. From among those cited by the counsel for the Dowsett, I find none sustaining a different rule of law than that which I adopt upon a similar state of facts.

I find it was the duty of the Dowsett to have seen the Moiwahine, and to have kept out of her way, and that the putting of the bow of the schooner off was the only departure she made from her course, and this was done when the collision was inevitable, and, in my view, was not even an error of judgment, but brought the place of the blow further aft, and lightened its effects so far as the schooner was concerned.

Counsel for the Moiwahine comments on the fact that nothing was done by the Captain to save the Dowsett. The engineer started her pumps, but found it was useless, as the water gained very rapidly, and he could not free her. Captain Dudoit says he

did not examine the injuries until he was in the boat with the intention of abandoning her. The look-out (Kealoha) says her stem was twisted off to one side. I think that the blow she gave the schooner was not what is called a "glancing blow," for it must have started the stem off its whole length, leaving the ends of her planking open, and the water flowed into her in torrents. I hardly think that shifting her sugar aft or throwing it overboard, or putting a tarpaulin over her bow, would have saved her, but it would have been better if Captain Dudoit had made efforts to do it, and I think he could safely have staid by her in his boats until she sank.

Having found that the Moiwahine is blameless for the loss of the Dowsett, and that the Dowsett caused the collision and the damage to the Moiwahine, the amount of the damage must be considered :

I allow the ship-carpenter's bill for repairs...................$270 30
Fees of three surveyors at $16...... ............................ 48 00
The schooner was detained six days, undergoing repairs; her
    expense is testified to by Captain Staples to be $18 per day.
    I allow for this................. ....... .................. 108 00
Mr. Sorenson, the shipwright, says the damage to the schooner
    by being strained is at least (which I allow).............. 250 00

       Total ...............................................$676 30

It does not become necessary, in view of my previous conclusions, to consider the question new in this country, whether Mr. Allen, as owner of the Moiwahine, would be liable to the owners of the Dowsett for more than the value of the Moiwahine.

The libel of the Pacific Navigation Company vs. S. C. Allen is dismissed. A decree may be taken out in the cross suit, condemning the Pacific Navigation Company in the sum of $676,30, interest and costs.

*Paul Neumann, L. A. Thurston, W. A. Whiting, Chas. Creighton*, for the Dowsett.

*Kinney & Peterson, S. B. Dole, R. F. Bickerton*, for the Moiwahine.